[Cite as *State v. Williams*, 2019-Ohio-794.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 107221

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**AHRON M. WILLIAMS**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-611731-A

**BEFORE:**  Sheehan, J., E.T. Gallagher, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:**  March 7, 2019

**ATTORNEY FOR APPELLANT**

Patrick S. Lavelle
Van Sweringen Arcade, Suite 250
123 West Prospect Avenue
Cleveland, OH 44115


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Daniel A. Cleary
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH   44113


MICHELLE J. SHEEHAN, J.:

{¶1} Appellant Ahron Williams appeals from a judgment of the trial court convicting him of murder, felonious assault, and discharge of firearm on or near prohibited premises. He claims his convictions were against the manifest weight of the evidence. He also argues there was insufficient evidence to support his murder and felonious assault convictions based on the alternative theory of complicity. In addition, he claims the trial court should have merged his murder offense and discharge of firearm on or near prohibited premises for sentencing. Finding no merit to his claims, we affirm the trial court's judgment.

{¶2} Appellant was indicted for aggravated murder, two counts of murder,[1] two counts of felonious assault, and discharge of firearm on or near prohibited premises. These charges

---

[1] Appellant was convicted of two counts of murder, in violation of R.C. 2903.02(A) and 2903.02(B). R.C. 2903.02(A) states that "[n]o person shall purposely cause the death of another * * *." R.C. 2903.02(B) states that

stemmed from a fatal shooting on the night of November 18, 2016, in which Demetrius Paul ("victim") was shot to death.

{¶3} After a jury trial, the jury convicted appellant of all counts except for aggravated murder.

**Testimony of Witnesses at Trial**

{¶4} The shooting occurred on Rugby Avenue, in front of a residential house where Devon Davis and his parents resided. Devon, a friend of the victim, did not witness the shooting but his parents did. Although Devon was not present on the day of the incident and not an eyewitness to the shooting, he testified regarding the hostile encounters between appellant and the victim leading up to the shooting.

**1. Devon Davis**

{¶5} Davis described the victim as his best friend, with whom he would hang out daily. He testified the victim and appellant were friends until an altercation at Rugby Avenue between the victim and appellant's little brother (Ahmere Cottingham) two months before the shooting. During that encounter, Cottingham and his friends had asked the victim for marijuana and the victim responded that "he don't deal around like that." This infuriated Cottingham and his friends because they did not like the victim's attitude. Cottingham pulled a gun out. "Smiley," who was friends with Devon and the victim, pulled his gun out too. Cottingham and "Smiley" shot at each other.

---

"[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." The felony murder charge against appellant was predicated on the underlying offense of felonious assault.

**{¶6}** A day after that incident, Devon ran into appellant at a restaurant. Appellant asked him if he knew anything about the incident at Rugby Avenue the day before and warned Devon to stay away from Rugby Avenue.

**{¶7}** A day later, Devon was in his driveway with the victim when he saw appellant driving a blue Impala down Rugby Avenue with his brother Cottingham and another person by the name of "Tashawn" in the vehicle. The vehicle pulled over and appellant and the victim started to argue. Appellant was upset that his little brother was shot at. He threatened that "someone is going to die" over "the situation."

**{¶8}** Days later, Devon was outside his house retrieving mail and witnessed a commotion at a gas station near his house. Appellant, his brother Cottingham, "Tashawn," and a fourth man were yelling at the victim. The victim started to retreat to Devon's house. Appellant and his brother were inside the Impala while "Tashawn" followed the victim on foot. "Tashawn" then fired shots at the victim and Devon.

**{¶9}** Devon described yet another incident in front of his house where appellant, his brother, and "Tashawn" pulled up in the same vehicle and appellant and his brother fired shots at Devon's house. Two bullets hit the house.

**{¶10}** Devon acknowledged that he had served time in prison for felonious assault with a gun specification. He was not present when the victim was killed because he was in prison for violating his community control sanctions.

## 2. Eyewitnesses

{¶11} There were three eyewitnesses to the shooting on November 18, 2016: the victim's friend Antonio McCain and Devon Davis's parents, Dwayne Davis and Larissa Davis. They testified that on the day of the shooting, appellant was first seen talking to the victim. Then appellant's brother Cottingham and "Tashawn" arrived in the blue Impala. Appellant's brother — the driver — got out of the vehicle, and after exchanging some words with the victim, he returned to the vehicle as if to retrieve something. A shooting then erupted. McCain testified he saw appellant shooting at the victim and saw no one else shooting. Dwayne Davis also saw appellant shooting at the victim, but testified the driver — appellant's brother — also had a gun. Larissa Davis saw *the driver* shooting at the victim. Although no one witnessed the victim shooting, his hands tested positive for gunshot residue. The witnesses specifically testified to the following.

### a. Antonio McCain

{¶12} McCain also described himself as "best friends" with the victim. He lived on Rugby Avenue near Devon Davis's parents. On the day of the incident, McCain came home after work around 5:30 p.m. He spent some time with the victim and then left to give someone a ride home. When McCain returned, he saw appellant and the victim talking to each other in Devon Davis's parents' driveway.

{¶13} Soon, a blue vehicle, which McCain described as either a Malibu or Impala, pulled up. Two men — appellant's brother and "Tashawn" — hopped out of the vehicle. There was some verbal altercation between them and the victim. "Tashawn" said to the victim "what are you moving for?" Appellant then pulled out his gun — a chrome handgun — and said to the victim "bitch-ass nigger, don't move" before shooting at him. Everyone was a foot away from

each other at that point. The first shot went directly to the victim's left leg. McCain immediately took off running. After the first shot, appellant continued to shoot while "back-pedaling" away running. The victim was running with McCain, into the Davises' driveway. McCain heard 15 or 16 more gunshots. The victim fell twice while running and ended up behind a truck. McCain called 911 for an ambulance. He testified that he did not see the victim shooting or anyone else holding a gun that night.

**b. Dwayne Davis**

{¶14} Dwayne Davis, Devon's father, lived in the Rugby Avenue house in front of which the shooting occurred. Dwayne considered the victim "like a son" to him; the victim was his son Devon's best friend, and Dwayne would see him everyday. Antonio McCain also visited his house frequently. On the night of the shooting, Dwayne was on his second-floor porch when he first heard noises outside his house. Dwayne saw the victim and McCain talking in an unfriendly manner with appellant, whom Dwayne described as someone in a hoodie with a tattoo on his neck.

{¶15} Dwayne went outside to tell McCain to leave. Just then a blue vehicle came down the street. The driver (later identified as appellant's brother) exited the vehicle and went up to the victim. After he said something to the victim, he went back to the vehicle as if to retrieve something. The shooting then erupted — the guy with the tattoo on his neck who was talking to McCain moments ago started shooting with an automatic handgun. Dwayne, McCain, and the victim all ran. While Dwayne was running toward his house, he heard 10 to 12 more gunshots. Both McCain and the victim were running up the driveway as well. The victim was limping with blood coming down his leg.

{¶16} When asked if he saw anyone else with a gun that night, Dwayne answered: "the guy that was looking like he could been his [appellant's] little brother or whatever, he had a gun too."

{¶17} During cross-examination, Dwayne testified as follows when he was asked if he saw the man who shot at the victim:

Q.   Did you see who did the shooting?

A.   Yeah, I saw the guy who did the shooting.   Why?   Do you want me to point him out?

Q.   No. I'm asking you * * *

A.   Look, man, that man right there shot him. (Indicating) okay? I seen him do it.

Q.   Okay.

A.   Now, I don't know what happened to his little brother, why he started shooting, but I seen him. (Indicating.)

Q.   You have never identified him before.

A.   No, I never identified him.   I'm looking up. I see him now.   I seen his face plain as day.

## c. Larissa Davis

{¶18} Larissa, Dwayne Davis's wife, also witnessed the shooting that night, but gave a somewhat different account.   She saw the entire event from the upstairs porch.   McCain and the victim were outside her house, talking to a man she did not know.   A blue vehicle pulled up. Sensing trouble, Larissa started to call 911.   The driver exited the vehicle, and the men exchanged words.   The driver then returned to the vehicle but came back with his hand down on his side, and started "blasting," shooting in the direction of the victim and McCain.   On cross-examination, when asked if it was the driver who shot the victim, she answered

affirmatively.   She also stated she heard three shots fired by that man.   She did not hear other shots.

**3. Other Witnesses for the State**

{¶19} Det. Gregory Cook, who responded to the shooting scene, testified appellant, his brother Ahmere Cottingham, and Tashawn McLemore were found that night in a location near Rugby Avenue. The blue Impala was also found there.   Ahmere Cottingham and Tashawn McLemore were detained.   Appellant himself had sustained gunshot wounds and was taken to the hospital in an ambulance.

{¶20} Det. Cook also testified that four shell casings were recovered at the scene, and that although he believed he recovered all the shell casings fired that night, there could have been other casings.   His investigation revealed there may be between 10 to 20 shots fired.   Based on the police investigation, he believed the victim was shooting as well that night.

{¶21} Curtiss Jones, a supervisor in the Cuyahoga County Forensic Science Laboratory, testified that the hands of the victim and appellant's brother Cottingham both tested positive for gunshot residue.   No testimony was provided as to whether appellant was also tested for gunshot wounds.

{¶22} James Kooser, a forensic scientist also from the Forensic Science Laboratory, testified that he examined four casings collected from the scene, and determined that two were fired from one gun and the other two from a different gun.   Three spent pellets were also recovered — one was the morgue bullet removed from the victim and the other two were found at the scene.   One of the two found at the scene was too damaged to be analyzed.    The other two undamaged pellets came from different guns.   Because it was impossible to match a spent

pellet and a cartridge casing, Kooser calculated as few as two guns and as many as five guns could be involved.

{¶23} Dr. Elizabeth Armstrong, a forensic pathologist with the Cuyahoga County Medical Examiner's Office, conducted the autopsy of the victim. She determined the victim's death was caused by two gunshot wounds to his left leg. One of the two shots was fatal as it perforated a major artery.

**4. Defense Witness**

{¶24} The defense called one witness, a manager in a used car dealership. He testified that he sold the blue Impala involved in this case to an individual by the name of Daniel Austin on September 26, 2016.

**Sentence**

{¶25} After trial, the jury convicted appellant of all counts except for aggravated murder. The trial court merged the murder and felonious assault counts for sentencing and sentenced him to life in prison with eligibility for parol after 15 years, and also a three-year term on the firearm specification, to be served prior and consecutive to the 15-year term. Appellant was in addition sentenced to 11 years for the discharge of firearm on or near prohibited premises and a three-year term on the firearm specification for that count. These two terms are to be served consecutively, for an aggregate sentence of 32 years to life.

**Assignments of Error**

{¶26} On appeal, appellant raises three assignments of error for our review. They state:

1. The jury determination in the lower court was against the manifest weight of the evidence.

2. There was not sufficient evidence presented to the jury in the lower court proceeding to convict the appellant on an accomplice liability theory.

3. The lower court erred when it sentenced appellant to consecutive sentences under counts two (murder) and six (discharge of firearm on or near a prohibited premises).

**Standard of Review for Sufficiency-of-Evidence and Manifest-Weight Claims**

{¶27} When reviewing a challenge of the sufficiency of the evidence, we review the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶28} While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins* at 390. Unlike a claim that the evidence is insufficient to support a conviction, which raise a question of law, manifest-weight challenges raise factual issues. When a defendant argues his conviction is against the manifest weight of the evidence, the court,

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). When we examine witness credibility, we must be mindful that "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). The trier of fact "is in the best position to observe the witnesses' demeanor, voice inflection, and mannerisms in determining each witness's credibility." *State v. Hughes*, 8th Dist. Cuyahoga No. 81768, 2003-Ohio-2307, ¶ 26. Furthermore, a trier of fact is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Wright*, 8th Dist. Cuyahoga No. 80555, 2002-Ohio-4279, ¶ 25.

{¶29} In evaluating a manifest-weight claim, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The assessment of their credibility is a matter for the trier of fact, and we will not substitute our judgment for that of the finder of fact. Having reviewed the record, we cannot say the trial court, as the trier of fact, lost its way.

**Murder**

{¶30} Under the first assignment of error, appellant argues his murder conviction was against the manifest weight of the evidence because there was conflicting testimony as to who shot and killed the victim. He points out the discrepancies in the evidence: while two eyewitnesses (Antonio McCain and Dwayne Davis) testified appellant shot the victim, the third witness Larissa Davis testified it was the driver of the Impala who shot the victim. In addition, the forensic evidence shows both the victim and appellant's brother tested positive for gunshot

residue, which called into doubt the credibility of McCain, because he testified he did not see anyone else with a gun that night.

{¶31} While there was conflicting testimony, "'an accused is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial.'" *State v. Taylor*, 10th Dist. Franklin No. 14AP-254, 2015-Ohio-2490, ¶ 34, quoting *State v. Rankin*, 10th Dist. Franklin No. 10AP-1118, 2011-Ohio-5131, ¶ 29. "The jury, as trier of fact, may take into consideration a witness's conflicting testimony in determining her credibility and the persuasiveness of her account by either discounting or resolving the discrepancies." *Id.*

{¶32} Here, the jury could have chosen to resolve the conflict in the state's favor: in addition to McCain's account, Dawyne Davis also testified appellant shot the victim. Although there were indeed discrepancies in the eyewitnesses' testimony and the forensic evidence, we note that the shooting happened suddenly and quickly, and each eyewitness saw the event from a different vantage point. The two witnesses (McCain and Dawyne Davis) identifying appellant as the shooter were outside the house and in closer proximity to where the shooting occurred, whereas Larissa Davis was observing the event from a second-floor porch and calling 911 as the event unfolded. The weight to be given to the evidence and the credibility of the witnesses are primarily for the trier of the facts. Having reviewed the evidence, we cannot say the jury lost its way in resolving the conflict in the evidence by finding the two eyewitnesses closer to the shooting scene more credible. The first assignment of error lacks merit.

**Murder on a Complicity Theory**

{¶33} Regarding appellant's murder offense, the trial court instructed the jury on complicity as an alternative theory of his criminal liability. Under the second assignment of

error, appellant argues there is insufficient evidence to convict him on an accomplice liability theory.

{¶34} R.C. 2903.03, Ohio's complicity statute, provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). A person who is guilty of complicity in the commission of an offense "shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated * * * in terms of the principal offense." R.C. 2923.03(F).

{¶35} The statute does not define aiding and abetting, but the Supreme Court of Ohio has held that, to support a conviction for complicity by aiding and abetting, the evidence must show that the defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796, syllabus. Furthermore, "[s]uch intent may be inferred from the circumstances surrounding the crime." *Id.* at 246.

{¶36} "'The mere presence of an accused at the scene of the crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.'" *State v. Langford*, 8th Dist. Cuyahoga No. 83301, 2004-Ohio-3733, ¶ 20, quoting *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). Instead, "[a]iding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed." *Id.* at ¶ 21, citing *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981).

{¶37} Our review of the record shows that the state produced sufficient evidence to convict appellant not only of murder but also murder on a complicity theory. Devon Davis

testified to the events precipitating the fatal shooting. Appellant's hostility toward the victim began after an altercation between his brother and the victim, in which appellant's brother and the victim's friend shot at each other. Appellant was upset that someone shot at his brother. He was seen days later driving with his brother and "Tashawn" on Rugby Avenue and threatening the victim with death in retaliation. Subsequently, appellant, his brother, and "Tashawn" were seen following the victim and "Tashawn" fired shots at the victim.

{¶38} On the night of the shooting, appellant and the victim were seen talking to each other. Gunshots erupted only after appellant's brother arrived with "Tashawn" in the Impala. After the shooting, appellant, his brother, and "Tashawn" fled in the Impala. The testimony, viewed in a light most favorable to the prosecution, could support appellant's conviction of murder based on his supporting, assisting, encouraging, or inciting the principal in the commission of murder and his sharing of criminal intent with the principal. Stated differently, the state produced sufficient evidence for the jury to infer appellant's participation in the crime from "presence, companionship, and conduct" before and after the fatal shooting. Although the evidence is circumstantial, circumstantial evidence is not less probative than direct evidence and in some instances even more reliable. *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988). For these reasons, the second assignment of error is without merit.

**Allied Offenses**

{¶39} Appellant was also convicted of discharging a firearm upon or over a public road or highway in violation of R.C. 2923.162(A)(3)[2] because the evidence showed he fired numerous gunshots while backing into the street. He does not challenge his conviction pursuant

---

[2]R.C. 2923.162 ("Discharge of firearm on or near prohibited premises") prohibits discharging a firearm within a hundred yards of a cemetery (R.C. 2923.162(A)(1)); on grounds of a school or church (R.C. 2923.162(A)(2)); or on a public road or highway (R.C. 2923.162(A)(3)).

to R.C. 2923.162(A)(3), but, in the third assignment of error he argues that conviction should be merged with his murder conviction under R.C. 2941.25.[3]

{¶40} "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution, prohibiting multiple punishments for the same offense." *State v. Johnson*, 2018-Ohio-1387, 110 N.E.3d 863, ¶ 28 (8th Dist.). R.C. 2941.25 states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶41} In *State v Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the Supreme Court of Ohio set forth a conduct-based analysis for allied offenses. First, the court determines whether it is possible to commit one offense and commit the other with the same conduct. *Johnson* at ¶ 48. If that is possible, then the court determines whether the two offenses were in fact committed by the same conduct — a single act, committed with a single state of mind. *Id.* at ¶ 49.

---

[3]We note that pursuant to R.C. 2923.162(C), discharging a firearm on prohibited premises such as a roadway is a misdemeanor of the first degree, but a felony of the first degree if it causes serious physical harm to a person. R.C. 2923.162(C)(1) and (C)(4). The indictment charged appellant with discharge of firearm on or near prohibited premises, a first-degree felony, and identified Demetrius Paul as the person who sustained serious physical harm.

**{¶42}** The analysis from *Johnson* has been supplanted by *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, however. *See State v. Dennis*, 2017-Ohio-4437, 93 N.E.3d 277, ¶ 22 (8th Dist.). The defendant's conduct is now only part of a proper allied-offense analysis. "Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if *any* one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, *or* (3) the conduct shows that the offenses were committed with separate animus." (Emphasis added.) *Ruff* at paragraph three of syllabus. Because this is a disjunctive test, an affirmative answer to any of the questions will permit separate convictions. *Id*. at ¶ 31.

**{¶43}** Regarding what constitutes dissimilar import, "[t]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at paragraph two of the syllabus. "[W]hen the defendant's conduct put more than one individual at risk, that conduct could support multiple convictions because the offenses were of dissimilar import." *Id*. at ¶ 23. "[O]ffenses are not allied offenses of similar import if they are not alike in their significance and their resulting harm." *Id.* at ¶ 21.

**{¶44}** We review an allied-offense claim de novo. *State v. Webb*, 8th Dist. Cuyahoga No. 98628, 2013-Ohio-699, ¶ 4.

**{¶45}** In *State v. James*, 2015-Ohio-4987, 53 N.E.3d 770, ¶ 33 (8th Dist.), this court held that the offense of discharging a firearm on a public road or highway is a strict liability offense and the victim is the public. *Id.* at ¶ 33-34.

**{¶46}** Applying *James*, this court subsequently held that discharging a firearm on or near prohibited premises and felonious assault should not merge. *Johnson*, 2018-Ohio-1387, 110

N.E.3d 863, at ¶ 32-33.    *See also State v. Carzelle*, 8th Dist. Cuyahoga No. 105425, 2018-Ohio-92; and *State v. Hardnett*, 8th Dist. Cuyahoga No. 107038, 2019-Ohio-105; *State v. Wright*, 7th Dist. Mahoning No. 15 MA 0092, 2017-Ohio-1211, ¶ 24 (felonious assault and improper discharge counts should not merge because the crimes involved separate victims and separate identifiable harms).

{¶47} The instant case is similar to *State v. Williams*, 2d Dist. Montgomery No. 27663, 2018-Ohio-1647.   The appellant in that case fired multiple shots in rapid succession across the road with the singular motivation of killing a targeted victim.   He was convicted of a murder and discharging a firearm on or near prohibited premises.   On appeal, he argued these offenses should be merged because the two offenses caused the same harm, namely, the life of the victim, and they constituted one action and were committed with the same animus.   The Second District rejected his claim.   Citing *James*, the court found the two offenses to be of dissimilar import. It reasoned that the appellant's act of firing a gun across the roadway placed numerous people at risk and harmed the public at large, while his murder conviction involved harm to a particular victim and therefore the offenses differed in significance and the nature of the harm caused.   *Id.* at ¶ 23-24.

{¶48} In support of his claim, appellant cites *State v. Melton*, 2013-Ohio-257, 984 N.E.2d 1112 (8th Dist.), and *State v. Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375.   In both cases, the defendant shot at the victim upon a roadway and this court concluded felonious assault and discharging a firearm upon or over a public road or highway should have been merged by the trial court.    Both cases were analyzed under the old *Johnson* test, however.    In both cases, this court applied the two-prong *Johnson* test and found the offenses should be merged.   *Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, however, was

supplanted by *Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892. Under *Ruff*, the court is to analyze not only the defendant's conduct but also whether the offenses are of dissimilar import, i.e., whether the defendant's conduct involves separate victims or if the harm resulting from each offense is separate and identifiable.

**{¶49}** Pursuant to *Ruff* and *James*, the two offenses committed by appellant involved different victims, the victim of the murder offense was Demetrius Paul while the victim of the discharging a firearm upon or over a public road or highway was the public at large, including the witnesses in the vicinity; the latter offense posed a great risk of harm to the public and that harm was separate and differed in its significance from harm to a specific victim. In other words, the two offenses were of dissimilar import. *Williams*. Under *Ruff*, the trial court here did not err in not merging the two offenses. The third assignment of error is without merit.

**{¶50}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

EILEEN T. GALLAGHER, P.J., and
PATRICIA ANN BLACKMON, J., CONCUR