[Cite as *In re T.W.*, 2021-Ohio-3037.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE T.W.

A Minor Child

: 
: No. 110243
:

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 2, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. DL-20-103448 and DL-20-103454

---

### *Appearances:*

Edward F. Borkowski, Jr., *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Luke Habermehl, Assistant Prosecuting Attorney, *for appellee.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} The Cuyahoga County Court of Common Pleas, Juvenile Division, found that appellant T.W. committed acts that, if committed by an adult, would constitute the offenses of aggravated robbery in violation of R.C. 2911.01(A)(1) with firearm specifications, having weapons while under disability in violation of R.C. 2923.13(A)(2), and improper handling of a firearm in a motor vehicle in

violation of R.C. 2923.13(B). T.W. appeals the court's admission of certain evidence at trial, the manifest weight of the court's findings on the charges, and its imposition of a serious youthful offender dispositional sentence. Because we find the evidence was stipulated to by counsel and did not need further authentication, the findings of guilt were not against the manifest weight of the evidence, and the court did not err by imposing a serious youthful offender sentence, we affirm the judgment.

I.       PROCEDURAL HISTORY AND FACTS

A.       PROCEDURE IN JUVENILE COURT

{¶ 2}   T.W. was charged in two cases for his involvement in robberies of internet ride service drivers. In Cuyahoga J.C. No. DL-20-103448, T.W. was charged with committing one count of aggravated robbery in violation of R.C. 2911.01(A)(1), one count of robbery in violation of R.C. 2911.02(A)(1), one count of robbery in violation of R.C. 2911.02(A)(2), one count of robbery in violation of R.C. 2911.02(A)(3), and one count of theft in violation of R.C. 2913.02(A)(1), each count having both one- and three-year firearm specifications. He was also charged with one count of having weapons while under disability in violation of R.C. 2923.13(A)(2), one count of improperly handling firearms in a motor vehicle in violation of R.C. 2923.13(B), and one count of theft in violation of R.C. 2913.02(A)(1).

{¶ 3}   In Cuyahoga J.C. No. DL-20-103454, T.W. was charged with committing one count of aggravated robbery in violation of R.C. 2911.01(A)(1), one count of robbery in violation of R.C. 2911.02(A)(1), one count of robbery in violation

of R.C. 2911.02(A)(2), one count of robbery in violation of R.C. 2911.02(A)(3), and two counts of theft in violation of R.C. 2913.02(A)(1), each count having both one- and three-year firearm specifications. He was also charged with one count of having weapons while under disability in violation of R.C. 2923.13(A)(2) and one count of improperly handling firearms in a motor vehicle in violation of R.C. 2923.13(B).

{¶ 4} After the complaint was filed, the state filed a motion for joinder of the two cases and also sought to have the cases bound over to felony court. The juvenile court granted the motion for joinder. After probable cause was found, the juvenile court later determined T.W. was amenable to the juvenile justice system and retained jurisdiction over the cases. The state then sought to have T.W. declared a serious youthful offender ("SYO") if found delinquent; thereafter, a grand jury indicted T.W. with the same charges as filed in the initial complaints.

B.     TRIAL PROCEEDINGS

1.     SUMMARY OF EVIDENCE PRESENTED AT TRIAL

{¶ 5}   T.W. waived his right to a jury, and the case proceeded to a bench trial. The state presented evidence of two armed robberies occurring over three days in which Uber and Lyft drivers' cars and phones were taken at gunpoint. Uber and Lyft are technology platforms that connect drivers and riders. Riders that have an account are able to schedule a ride through a mobile app. Typically, when an account holder of either service seeks a ride, a driver will accept the ride request through the respective app and will verify that the person seeking the ride is the

account holder.  However, it is not uncommon for account holders to allow others to use their accounts for the services.

{¶ 6}  The robberies of both drivers were committed in a similar manner. In both, the driver received a ride request through an app from an account holder. The riders to be picked up, three young men, were not the account holders that requested the ride.  During the rides, the young men asked to be dropped off prior to their ultimate destination.  After the driver stopped, two of the young men would leave the car and one would remain.  The remaining young man would brandish a firearm, have the driver get out of the car, leaving his/her cell phone, and drive off in the car.

2.    STIPULATION TO THE ADMISSION OF RECORDS

{¶ 7}  Before trial, the court inquired whether the parties had made any stipulations.  The state responded there was agreement regarding the following stipulations:

> PROSECUTOR:  Yes, your Honor.  Thank you.  The State would like to say there are a couple stipulations before we get started here.  The parties have agreed, the State and defense counsel, we have agreed to stipulate that the alleged delinquent's date of birth was * * * which would make him 17 at the time in question in these matters. Additionally, the parties agree to stipulate that the incidents in question occurred in Cuyahoga County.
>
> THE COURT:  Thank you.
>
> PROSECUTOR:   And just a couple more matters moving on to evidentiary matters.  At this time in summation the State intends to introduce previous trial records; specifically, Lyft, Uber and Instagram records, and the parties have stipulated as to the authenticity of those records.

THE COURT: Okay.

The court then confirmed with T.W.'s trial counsel that there was a stipulation to T.W.'s date of birth and to venue. As to the stipulation of exhibits, the court stated to trial counsel:

> THE COURT: And then we will address the authenticity as well as any certified journal entries at the time that you try to either introduce those to a witness or you move to admit those into evidence. I will hear from counsel with respect to those, okay?

> DEFENSE COUNSEL: Okay.

{¶ 8} During the presentation of its evidence, the state called Cleveland Police Department Detective Timothy Cramer to testify and introduced exhibit No. 2, Lyft records, exhibit Nos. 3-A, 3-B, and 3-C, Instagram records, and exhibit No. 4, Uber records. These were the exhibits the state informed the court that the parties "had stipulated to the authenticity of." The first of these exhibits used was exhibit No. 2. When the state asked Det. Cramer to describe the contents of exhibit No. 2, T.W.'s defense counsel interjected:

> DEFENSE COUNSEL: Your Honor, just for the record, I'm not objecting here because I believe this is one of these documents that I agreed to stipulate to.

> PROSECUTOR: Oh, yes, your Honor.

> THE COURT: He can still read them into the record so the record's clear.

> DEFENSE COUNSEL: I know. I'm just letting everybody know that that's why —

> THE COURT: I can take that. Thank you.

**{¶ 9}** The state proceeded to introduce the remaining exhibits it had stated were subject to the stipulation during Det. Cramer's testimony. When first asking about the contents of the Instagram text messages contained in exhibit No. 3-A, T.W.'s trial counsel interjected and stated, "I don't want to object, your honor. I'm just trying to keep track. I have my own sheets here and I'm not quite sure what I'm trying to follow." After that interjection, a discussion was had off the record and thereafter, Det. Cramer's testimony as to exhibit No. 3-A and its contents continued. Trial counsel did not object to the contents or authenticity of exhibit No. 3-A, but did lodge objections to Det. Cramer's interpretation of the contents of the exhibit.[1] Similarly, when the state introduced exhibit Nos. 3-B, 3-C, and 4, trial counsel did not object to the authenticity of the exhibits, but did lodge objections to characterizations or opinions regarding the contents of the exhibits. At the close of trial, the state offered the exhibits into evidence and they were admitted without objection.

3.  TESTIMONY AT TRIAL

**{¶ 10}** Lyft driver Berant Rivera testified that on November 26, 2019, he was working at night and accepted a request for a ride. He said he always calls the account holder to verify the request. When he called this account, the person requesting the ride said he was not the account holder but that the ride was for his

---

[1] For example, trial counsel objected to Det. Cramer's characterization of the messages by saying "T.W. sent" the message, noting that the exhibit showed only that the message was sent from the account.

cousins wanting to go someplace near Kingsford on the east side. Rivera drove to the pick-up area, and three young men were there. They got in Rivera's car, and at one point in the ride, one asked to have the interior lights turned off. Then they asked to be dropped off short of the destination. When Rivera stopped the car, two men got out and walked in the direction the car was pointed. The one who remained drew a gun and brandished it. Rivera asked to keep his phone but the man would not let him, and Rivera got out and ran. The gunman drove off with his car. Rivera spotted a police car on the next street and reported the crime.

{¶ 11} Cleveland Police Department Officer Cody Sheets testified that on November 26, 2019, he was assigned to the Fourth District. He stated that around midnight, as he was finishing a traffic stop, he was approached by Rivera who said his car was stolen by three males on the next street. Officer Sheets learned what happened and broadcast a description of Rivera's car. He later canvassed the area for the stolen car, but did not locate it.

{¶ 12} At around 5:00 a.m. on November 27, Officer Sheets was informed that Rivera's car was found by officers from the Third District and that a juvenile male, F.B., was taken into custody for receiving stolen property. According to later testimony from Det. Timothy Cramer of the Cleveland Police Department who investigated the robbery, Rivera identified F.B. as the person who remained in the car with the gun.

{¶ 13} The second robbery victim, Juanita Alexander, a retiree, testified that on November 29, 2019, she was working as an Uber driver and accepted a ride

request from a female's account. When she got to the pick-up location, she found three young men. They verified the account name with her, she accepted them as passengers, and the three got in the back seat of her car. During the ride, she talked with two of them; one did not talk. She learned from the male sitting in the middle of the back seat that he was interested in boxing and had worked at the Zanzibar restaurant at Shaker Square.

{¶ 14} Alexander testified that short of the planned destination, one of the males asked her to stop the car. She thought the male sitting in the middle asked her to stop, but was not sure if it was him or the young man sitting directly behind her. When she stopped, the male in the middle and the male behind her got out and one male remained. When the remaining male pulled out a handgun, she asked if she could take her phone. He said no but allowed her to take her purse. He ordered her out of her car, and he climbed into the front seat and drove off.

{¶ 15} Cleveland Police Department Det. Zara Hudson was assigned as a patrol officer the night Alexander was robbed, and responded to the call. Det. Hudson obtained information about the robbery and broadcast the stolen car's description and license. About 15 minutes later, Officer Hudson learned the car had been seen by police officers, had fled, and eventually crashed. Officer Hudson went to the scene of the crash and arranged for the car to be processed and towed.

{¶ 16} Det. Cramer testified that he was assigned to investigate the robberies and, during his investigation, he reviewed all reports and bodycam footage available from patrol officers, subpoenaed Lyft for information regarding the account used to

obtain the ride, obtained a search warrant for Uber for information regarding the account used to obtain the ride, and was able to review Instagram records that were obtained via a search warrant by another Cleveland Police Detective.

{¶ 17} Det. Cramer testified that he identified T.W. as a suspect because T.W. was an associate of F.B., the destination of the rides were in the area of T.W.'s home, and T.W.'s and F.B.'s Instagram accounts indicated they were associated. In addition, Det. Cramer went to Zanzibar restaurant in Cleveland to ascertain whether any of the suspects he had identified had worked there, based on information from Alexander. While at the restaurant, Det. Cramer testified he met with the manager and other employees. He laid out photographs of suspects on a table, which included T.W.'s photo. No one there identified any of the suspects.

{¶ 18} Det. Cramer testified that from reviewing the Uber records, he learned that Larry Bonchek was connected to the account. From the Lyft records, Det. Cramer learned that the ride Rivera accepted was requested by C.M., T.W.'s mother, and that the destination of the ride was 14232 Kingsford St.; he also identified the means of payment. The email and phone number associated with the account were linked to Larry Bonchek. Det. Cramer spoke with C.M., who denied ordering the Uber ride and denied having a card that matched the payment used for the ride. C.M. did confirm that she knew Larry Bonchek and that he was familiar to the family.

{¶ 19} Det. Cramer testified that he reviewed the public facing portions of F.B.'s and T.W.'s Instagram accounts. He noted that T.W.'s account had a boxing

emoji and that the accounts followed each other. Det Cramer also testified as to specific text messages that were in T.W.'s Instagram account. Specifically, within an hour after Rivera was robbed of his car at gunpoint on November 27, T.W.'s account sent a message to one user indicating that he was "in a whip" and, a minute later, sent a message to another user stating "i gotta whip again." Det. Cramer testified that a "whip" is a term for a stolen car. Shortly after these messages were sent, a message was sent that he was with "Nuke," a name used by F.B. After the Uber robbery on November 29, T.W.'s account sent a message indicating that "we got a car again."

{¶ 20} In addition to the messages sent close in time to the robberies, T.W.'s account had a conversation with F.B.'s brother, which indicated T.W. was aware F.B. was "on lock" for a robbery, but "not with the old lady the first one." Further, Det. Cramer discovered a video sent in December to T.W.'s account. The video showed Det. Cramer at Zanzibar restaurant from behind, and the video then zoomed in on T.W.'s photograph that was on the table.

{¶ 21} Det. Cramer obtained an arrest warrant for T.W. After his arrest by the Beachwood Police Department, T.W. agreed to be interviewed. T.W. confirmed the Instagram account that Det. Cramer reviewed was his. T.W. denied knowing anything about the robbery, but when confronted with the video from Zanzibar restaurant, T.W. said he remembered the incident, but that he was not in the car. T.W. eventually admitted he was in the car for the Uber robbery and did speak with Alexander. He also admitted he was in the car for the Lyft robbery as well. T.W.

also corrected Det. Cramer during the interview, stating that his social worker "Larry" paid for the Lyft ride, not his mother.

4.    THE JUVENILE COURT'S DISPOSITION OF THE CASES

{¶ 22} The court entered findings of guilt on all counts and specifications as charged in the indictments.  The court held a disposition hearing on December 21, 2020, at which the state and T.W. agreed that in both cases, the charges of aggravated robbery were allied offenses of similar import with the robbery and theft charges.  The state elected for the trial court to proceed to disposition and sentence on the aggravated robbery charges.

{¶ 23} In Cuyahoga J.C. No. DL-20-103448, the court committed T.W. to the custody of the Ohio Department of Youth Services ("ODYS") for one year on the firearm specifications and to two years on the aggravated robbery charge.  It imposed a six-month commitment to ODYS for the charges of having weapons while under disability and improper handling of a firearm in a motor vehicle, and ordered those commitments to be served concurrently, but consecutively to the commitment imposed for aggravated robbery.  In total, the court committed T.W. to the custody of ODYS for an aggregate minimum term of three years and six months.

{¶ 24} In Cuyahoga J.C.  No. DL-20-103454, the court committed T.W. to the custody of the ODYS for one year on the firearm specifications and two years on the aggravated robbery charge.  It imposed a six-month commitment to ODYS for the charges of having weapons while under disability and improper handling of a firearm in a motor vehicle, and ordered all commitments to be served concurrently

to each other and concurrently to the commitments imposed in Cuyahoga J.C. No. DL-20-103448.

{¶ 25} After announcing the juvenile disposition in the cases, the court proceeded to impose an SYO sentence upon T.W. In DL-20-103448, the court imposed a suspended indefinite sentence of three to four and one-half years' imprisonment for the aggravated robbery charge, nine-month terms of imprisonment on the having weapons while under disability and improper handling of a firearm in a motor vehicle charges, and ordered that all sentences were to be served concurrently. The court imposed a sentence of three years' imprisonment on the firearm specifications, which was ordered to be served prior to and consecutive to the sentences on the underlying charges.

{¶ 26} In Cuyahoga J.C. No. DL-20-103454, the court imposed a suspended indefinite sentence of three to four and one-half years' imprisonment for the aggravated robbery charge, nine-month terms of imprisonment on the having weapons while under disability and improper handling of a firearm in a motor vehicle charges, with all sentences to be served concurrently to each other and to the sentence imposed in DL-20-103448. The court imposed a sentence of three years' imprisonment on the firearm specifications, which was ordered to be served prior to and consecutive to the sentences on the underlying charges in both cases. In total, the court imposed a suspended sentence of nine to ten and one-half years' imprisonment.

II.   LAW AND ARGUMENT

   A.  STIPULATION TO AUTHENTICITY OF RECORDS

{¶ 27} The first assignment of error raised by T.W. reads:

The trial court plainly erred by admitting unauthenticated evidence.

{¶ 28} In his brief, T.W. argues that the Instagram documents, exhibit Nos. 3-A, 30-B, and 3-C, were admitted in error because they were not properly authenticated pursuant to Evid.R. 901.  The court admitted these exhibits without objection by T.W.'s trial counsel.  T.W. concedes that because no objection was made at trial, this court's standard of review is not whether the court abused its discretion, but whether the admission of the exhibits amounted to plain error.  Plain error exists when it can be said that but for the error, the outcome of the trial would clearly have been otherwise.  *State v. Issa*, 93 Ohio St.3d 49, 56, 752 N.E.2d 904 (2001), citing *State v. Moreland*, 50 Ohio St.3d 58, 62, 552 N.E.2d 894 (1990).

{¶ 29} In examining the circumstances of the court's admission of the exhibits, we must first determine whether or not the admission of the Instagram records was error.  "A stipulation, sometimes used synonymously with contract, is a voluntary agreement entered into between opposing parties concerning the disposition of some relevant point to avoid the necessity for proof on an issue." *Rice v. Rice*, 8th Dist. Cuyahoga No. 78682, 2001 Ohio App. LEXIS 4983, 11 (Nov. 8, 2001), citing, *Burdge v. Bd. of Cty. Commrs.*, 7 Ohio App.3d 356, 358, 455 N.E.2d 1055, 1058 (10th Dist.1982).  The effect of the stipulation is that the exhibit is evidence in the case.  *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826

N.E.2d 266, ¶ 40. "'It is, in truth, *a substitute for evidence*, in that it does away with the need for evidence.'" (Emphasis added.) *Id.*, quoting 9 Wigmore, *Evidence*, Section 2588, 821, (Chadbourn Rev.1981).

{¶ 30} Prior to trial, the state informed the court that as to "Lyft, Uber and Instagram records, * * * the parties have stipulated as to the authenticity of those records." The court told counsel that it would "address the authenticity as well as any certified journal entries at the time that you try to either introduce those to a witness or you move to admit those into evidence. I will hear from counsel with respect to those, okay?" During Det. Cramer's testimony, the state used exhibit Nos. 3-A, 3-B, and 3-C. T.W.'s trial counsel specifically stated he did not object to the first of these exhibits, believing it was one to which he stipulated. When the state used the remaining Instagram records, trial counsel did not object to the records themselves, their contents, or their authenticity. Finally, trial counsel did not object to the admission of these exhibits at the close of the state's case.

{¶ 31} On this record, we find a stipulation existed regarding the authenticity of the Instagram records. As such, the stipulation allowed the state to proceed at trial without further witnesses being called to authenticate the documents. Because we find the authenticity of the Instagram exhibits was stipulated to and where T.W. makes no other argument regarding error in the admission of the exhibits, we cannot say that the admission of the evidence was error, plain or otherwise. The first assignment of error is overruled.

B. THE FINDINGS OF GUILT ARE NOT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE

{¶ 32} The second assignment of error raised by T.W. reads:

Appellant's convictions are against the manifest weight of the evidence.

{¶ 33} T.W. argues the evidence was deficient to sustain findings of guilt because "the court did not properly evaluate witness credibility, evaluate the evidence presented, and effectively resolve the conflicting testimony." The state argues that the evidence showed that T.W. booked the rides, sent messages indicating he was in the cars after the robberies, that he was with F.B. after a robbery, and T.W. sent a message that he was aware of specific details of the robberies.

{¶ 34} A challenge to the manifest weight of the evidence after a criminal conviction asserts that the state has not met its burden of persuasion in obtaining the conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). The manifest weight challenge raises factual issues:

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *State v. Townsend*, 8th Dist. Cuyahoga No. 107177, 2019-Ohio-544, ¶ 20. Ohio's complicity statute, R.C. 2923.02, provides in relevant part, that, "[n]o person, acting with the kind of culpability required for the commission of an offense,

shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). This court has held

> [t]he statute does not define aiding and abetting, but the Supreme Court of Ohio has held that, to support a conviction for complicity by aiding and abetting, the evidence must show that the defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796, syllabus. Furthermore, "[s]uch intent may be inferred from the circumstances surrounding the crime." *Id.* at 246.

*State v. Williams*, 2019-Ohio-794, 132 N.E.3d 1233, ¶ 35 (8th Dist.). In order to be found complicit, mere presence is not sufficient and the "'the accused must have taken some role in causing the commission of the offense.'" *State v. Capp,* 8th Dist. Cuyahoga No. 102919, 2016-Ohio-295, ¶ 25, quoting *State v. Howard,* 8th Dist. Cuyahoga No. 97695, 2012-Ohio-3459, ¶ 23. Further, the circumstances to be considered in assessing complicit behavior "may include the offender's presence, companionship, and conduct before and after the crime is committed." *State v. Crosby*, 8th Dist. Cuyahoga No. 106504, 2018-Ohio-3793, ¶ 12; *State v. Moore*, 7th Dist. Mahoning No. 02 CA 152, 2004-Ohio-2320, ¶ 31.

{¶ 35} The court did not err by entering findings of guilt in this case where the evidence supported a finding that T.W. was a participant in the robberies and aided and abetted the gunman in the taking of the cars. T.W. was in the position to book the Lyft and Uber rides and was aware of who paid for them. T.W. admitted being in the cars. T.W. left the cars before the ultimate destinations were reached and immediately before the robberies. The court could find that T.W. was an active

participant in the robberies in that he obtained the rides and was aware of the pending robbery when the rides were cut short and when he left the cars. Further evidence bolsters this determination where the Instagram messages indicate that T.W. admitted being in one of the stolen cars and that he was with F.B. T.W.'s participation after the fact is further supported by the evidence that he was aware F.B. had only been charged with one of the robberies, knowing that F.B. was not charged with the Uber robbery of Alexander. Given this evidence, we cannot say the findings of guilt are against the manifest weight of the evidence and the second assignment of error is overruled.

> C. THE JUVENILE COURT DID NOT ABUSE ITS DISCRETION BY IMPOSING AN SYO SENTENCE

**{¶ 36}** The third assignment of error reads:

> The trial court erred by finding appellant to be a serious youthful offender.

**{¶ 37}** T.W. argues that the court abused its discretion by imposing SYO sentences because, four months earlier, the court found him amenable to the justice system. The state argues that the court did not err and was not inconsistent in retaining jurisdiction over T.W. and imposing a blended SYO sentence.

**{¶ 38}** The court's disposition in a delinquency case is reviewed for an abuse of discretion. *In re D.B.,* 8th Dist. Cuyahoga No. 87196, 2006-Ohio-2891, ¶ 11. "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 39} In this case, the court determined that T.W. was amenable to the juvenile justice system and retained jurisdiction of the instant cases. That finding was based upon a determination of whether T.W. was amenable "to care or rehabilitation within the juvenile system" and whether the "safety of the community" would require transfer to adult court. R.C. 2152.12(B)(3). After the court retained jurisdiction of the cases, if found delinquent, T.W. would be subject to disposition as a juvenile offender. In these cases, the court's disposition includes a potential SYO sentence.

{¶ 40} T.W.'s argument that an amenability determination precludes the imposition of an SYO sentence conflates two separate required findings of the court made with different purposes. In deciding whether to retain jurisdiction of a delinquency case, the court is tasked with determining whether the child is amenable to rehabilitation within the juvenile justice system. Once a child has been found delinquent, the court must impose a disposition that fulfills its purpose to "provide for the care, protection, and mental and physical development of children subject to this chapter, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender." R.C. 2152.01(A). Further, the court is tasked with attaining this goal by employing "a system of graduated sanctions and services." *Id.* An SYO disposition is one part of the graduated system of sanctions imposed in these cases. As the Ohio Supreme Court noted, "[t]heoretically, the threat of the imposition of an adult sentence encourages a juvenile's cooperation in his own rehabilitation, functioning

as both carrot and stick." *State v. D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, ¶ 18.

{¶ 41} Once the decision to retain jurisdiction is made and after a child is found to be delinquent, the court has all of the resources within the juvenile justice system in determining an appropriate disposition. In these cases, those resources include the ability to impose an SYO sentence. Accordingly, after T.W. was found amenable to the juvenile justice system, the trial court did not abuse its discretion in finding an SYO sentence appropriate. The third assignment of error is overruled.

III.    CONCLUSION

{¶ 42} The court did not err in admitting Instagram records in this case where the record reflects a stipulation existed to the authenticity of the records. Further, the findings of guilt entered by the court were not against the manifest weight of the evidence where it was shown that T.W. participated in arranging for the rides, rode in the cars before F.B. committed the actual robbery, and acknowledged his presence in the stolen cars after the fact. The court did not err by imposing an SYO sentence simply because it had retained jurisdiction of T.W. and his cases.

{¶ 43} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution. The

trial court's adjudication of delinquency having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of commitment.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
MARY EILEEN KILBANE, J., CONCUR