JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant, Patrick Williams ("Williams"), appeals his conviction for aggravated murder, murder, and felonious assault. He raises four assignments of error for our review:
 {¶ 2} "[1.] The evidence was insufficient as a matter of law to support a finding beyond a reasonable doubt that the appellant was guilty of aggravated murder, murder and felonious assault.
 {¶ 3} "[2.] Appellant's convictions for aggravated murder, murder and felonious assault were against the manifest weight of the evidence.
 {¶ 4} "[3.] The trial court abused its discretion by giving the jury a flight instruction.
 {¶ 5} " [4.] Appellant was denied his right to effective assistance of counsel guaranteed by Article I, Section 10 of the Ohio Constitution and the Sixth and Fourteenth Amendments of the United States Constitution when trial counsel failed to subpoena an alibi witness and failed to question or otherwise challenge juror No. 11 *** during the voir dire state of the trial."
 {¶ 6} For the reasons that follow, we affirm.
 Procedural History and Evidence Presented {¶ 7} The grand jury indicted Williams on five counts: count one, aggravated murder, in violation of R.C. 2903.01(A); count two, murder, in *Page 4 
violation of R.C. 2903.02(B); count three, felonious assault, in violation of R.C. 2903.11(A)(2); count four, felonious assault, in violation of R.C. 2903.11(A)(1); and count five, felonious assault, in violation of R.C. 2903.11(A)(2). All counts contained one-and three-year firearm specifications. A jury trial commenced, and the following evidence was presented.
 {¶ 8} Erika Wright testified that in December 2006, when the events occurred, she was living with her mother, Karen Wright, and her sister, Khristine Wright, in Arbor Park Village located at East 40th Street and Woodland Avenue. The victim, Tynell Anderson (whose nickname was "Boo Nell"), was her boyfriend at that time and the father of one of her children. They had been dating for eight years when he was murdered, although they had broken up many times during that period.
 {¶ 9} Erika stated that she had recently been released from Marysville prison after being convicted of theft. She also had prior convictions of drug trafficking and automobile theft. Tynell was her codefendant in the automobile theft case. She also explained that Tynell had been convicted of drug trafficking and robbery.
 {¶ 10} During one of the times when Erika and Tynell had broken up, Tynell dated Marteese Williams for a couple of months. Marteese also lived at Arbor Park, right around the corner from Erika's mother's. Erika socialized with *Page 5 
Marteese and her family during the summer of 2006, including Marteese's mother, Valencia Williams, and her brother, Patrick Williams (the appellant), whose nickname was "P.J." Erika stated that she had been to Marteese's house on several occasions. But by December 2006, Erika was dating Tynell again, so her relationship with Marteese had deteriorated.
 {¶ 11} On the evening of December 30, 2006, Erika and Tynell walked to Dave's Supermarket at East 40th Street and Quincy Avenue. On the way there, they saw Marteese walking across the parking lot. Erika and Tynell began arguing loudly about Marteese. Marteese overheard them and "jumped into the conversation." Erika and Marteese continued to exchange words the rest of the way to the grocery store.
 {¶ 12} When they arrived at Dave's Supermarket, Erika said that Marteese spit in her face, and in response she hit Marteese, and a fight ensued. Tynell tried to break up the fight, but Erika stated that a Cleveland police officer broke up the fight. Marteese left the store immediately. Erika and Tynell shopped for five or ten minutes, and then walked back to Erika's mom's house, which took another five or ten minutes.
 {¶ 13} Approximately ten minutes after they got back, the doorbell rang. Erika went to the intercom and asked who it was. She heard a male say, "is Erika there?" She said "no" because she was not expecting anyone, and she did *Page 6 
not recognize the male's voice. She walked to the window, looked outside, and saw Valencia screaming and yelling "up at the window" (they lived on the second floor). Erika said she walked downstairs to talk to Valencia. When she got outside, Valencia began yelling at her. When this occurred, Erika said that it was evening and not "real bright outside," but it "was still light time outside."
 {¶ 14} Erika testified that she was trying to talk to Valencia when she noticed a two-door, dark green car parked on the street. She said that she was not "really too good with cars," but that it looked "like a Grand Am." She explained that the yard was small, so the car was "real close." She could see that Marteese was in the driver's seat. As soon as she saw the car, she noticed Williams "getting into the back seat" of the vehicle. She said, "but I guess once he heard me and his mom arguing *** he got back out of the car" and "started walking towards the door." Williams was wearing "a gray hoodie," which was "over his face," but Erika said that she knew who he was "even still with the hoodie on." She still knew who he was because "I know what he looked like and he was coming towards me."
 {¶ 15} Erika testified that as Williams walked past her, she asked him, "why you all coming up here?" Williams replied, "fuck that, where is that whole ass nigger, Boo Nell at?" As soon as he walked past her, and when her back was to him, Erika heard the first gunshot. She turned around and saw "P.J. walking *Page 7 
behind Tynell shooting the gun." She said that Williams had a black handgun and was walking "right behind" Tynell shooting it at him. At that time, she saw Tynell running back into the house. She also saw that her mother and her sister had come outside. Her mother followed Tynell back into the house. Erika said that she heard "about five shots" fired. After he was done shooting, Erika saw Williams run back to the car.
 {¶ 16} Erika further testified that after the shooting, she ran into the house and saw that Tynell had been shot. She said that her mother had already called 9-1-1, but she called too because she thought it was taking too long for someone to come. The 9-1-1 tape was then played for the jury. Although the whole tape is not comprehendible because there is a lot of yelling, it is clear that the dispatcher asked Erika who shot Tynell. Erika said that she was the one on the tape who told the dispatcher that it was a man named "P.J."
 {¶ 17} On cross-examination, Erika said that she knew Williams, but did not know him well enough to recognize his voice on the intercom. She said that Marteese had a white car, but on that night she was driving a green car.
 {¶ 18} Erika's mother, Karen, testified next. Karen explained that after Erika and Tynell came back from the store, the doorbell rang. Erika went downstairs (i.e., outside) and Karen could hear her arguing with a woman. Karen said that she went downstairs because she does not like "confusion in *Page 8 
front of my door." She saw a woman yelling at Erika and she saw a car in the street. Karen said that she tried to tell the woman, "talk to me, I'm her mother." But then she saw a man coming up on her left and she heard him say, "[h]ey, man, I heard you was around here fucking with my sister." Karen looked and saw that the man had a black gun that was "in her face." She said that he was holding the gun to the side, like a "[g]angster." He fired the gun and it was so close to her that she "saw the fire come out of it" and "smelled the stinky oily smell." She said that she ran behind her van, but she could see Tynell running from the shooter, back toward her house. She heard five or six shots, not random, but "like [the shooter] was trying to hit a moving target." But the shooter himself was not moving; "he was stationary. He stood still."
 {¶ 19} Karen explained that the woman who had been yelling at Erika got into the four-door vehicle that was parked in front of her house. The shooter took off running down the street.
 {¶ 20} Karen testified that when the shooting occurred, the street lights were on because it was dark outside. She saw that the shooter was a dark-skinned African American, but she did not get a good look at him because "there was a pistol in [her] face."
 {¶ 21} Khristine testified next. She corroborated Erika's and Karen's version of the events, except for the following differences. She said that she *Page 9 
"knew of" Marteese and Williams, but did not know them personally. She said that she went to the window with Erika and saw Valencia, whom she had never seen before that day, and Williams standing outside their door, and she saw Marteese sitting in a car. She said her mother went outside first, followed by her and Erika. She saw Williams in front of their door as soon as she went outside. She could not remember what he was wearing, but thought that he was wearing a "hoodie."
 {¶ 22} Khristine said that after a couple of minutes, Tynell came out of the house. At that time, she saw Williams pull out a black gun "from somewhere off his body" and start shooting. She heard Williams say, as he was pulling the gun out, "something about his sister, referring to what happened at the grocery store." Khristine saw the first shot and then took off running down the street. She did not run far. She turned around and saw Tynell run into the house and saw Williams shooting into the doorway of the house. She did not see where Williams or his mother went after the shooting.
 {¶ 23} Cleveland Police Officer Patrick McLain testified that on the night of the shooting, he was working with his partner, Angel Sarra, on routine patrol. They received a call around 6:15 p.m. "for a male shot." They found a bullet on the ground and one in the front doorframe. There was also a bullet slug at the bottom of the doorframe. Officer McLain testified that they received the name of *Page 10 
a suspect that evening and began searching for him, but they were not able to locate him that evening.
 {¶ 24} Detective Tim Entenok testified that he arrived at MetroHealth on the night of the incident. By the time he and his partner arrived, Tynell had already been pronounced dead. He interviewed Erika at the hospital. She gave them Williams' name and later identified Williams in a photo array. He said they obtained written statements from Erika, Karen, and Khristine approximately three days after the incident. Karen was not able to identify Williams in a photo array. Detective Entenok testified that the firearm was never recovered.
 {¶ 25} On cross-examination, Detective Entenok testified that Erika described the "getaway vehicle" to him as a green Pontiac or Trans Am. He said they searched police database listings as to whether Marteese owned such a car. They found that Marteese Williams owned a 1995 Pontiac, four-door Grand Prix. An official document from the Bureau of Motor Vehicles, however, indicated that this vehicle was impounded on November 20, 2006 and "junked" on January 24, 2007.
 {¶ 26} At the close of the state's case-in-chief, Williams moved for a Crim. R. 29 acquittal. The trial court granted it as to count five, but denied it as to the remaining counts. *Page 11 
 {¶ 27} The jury found Williams guilty of counts one through four, aggravated murder, murder, and two counts of felonious assault, and all of the firearm specifications. The trial court merged the firearm specifications for purposes of sentencing. It then imposed three years in prison for the merged firearm specifications and ordered that they be served consecutive to and prior to all other counts. The trial court then sentenced Williams to life in prison with parole eligibility after twenty years on count one, aggravated murder; fifteen years to life in prison on count two, murder; seven years on both felonious assault convictions, counts three and four; ordered that counts one through four be served concurrent to one another; and advised Williams that he would be subject to five years of postrelease control upon his release from prison.
 {¶ 28} It is from this judgment that Williams appeals, raising the four assignments of error set forth previously.
 Sufficiency of the Evidence {¶ 29} In his first assignment of error, Williams maintains that the evidence was insufficient to convict him of aggravated murder, murder, and felonious assault. Specifically, he argues that the evidence was not sufficient to identify him as the shooter, and he further argues that the state failed to prove that he acted with "prior calculation and design," which is a required element of aggravated murder. *Page 12 
 {¶ 30} In State v. Thompkins (1997), 78 Ohio St.3d 380, 386, the Supreme Court of Ohio explained that sufficiency of the evidence and weight of the evidence are not synonymous legal concepts. They are "both quantitatively and qualitatively different." Id.
 {¶ 31} The high court further explained:
 {¶ 32} "With respect to sufficiency of the evidence, `"sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim. R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955),162 Ohio St. 486. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982),457 U.S. 31, 45, citing Jackson v. Virginia (1979), 443 U.S. 307." Id. at 386-387.
 {¶ 33} When determining sufficiency of the evidence, we must consider whether, after viewing the probative evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense proven beyond a reasonable doubt. State v.Shaffer, 11th Dist. No. 2002-P-0133, *Page 13 2004-Ohio-336, ¶ 17. Further, we note that the verdict will not be disturbed on appeal unless the reviewing court finds that reasonable minds could not have arrived at the conclusion reached by the trier of fact. State v. Dennis (1997), 79 Ohio St.3d 421, 430.
A. Identification Evidence
 {¶ 34} Williams argues that Erika was the only one who identified him in a photo array, but that her testimony was weak because she testified that "the shooter was wearing a hoodie and that the hood was over his face at the time of the shooting." He further contends that Erika would not have been able to see well because the lighting conditions were poor.
 {¶ 35} We disagree with Williams that the identification evidence was not sufficient. Erika also testified that she knew Williams (as "P.J."). She said that she had seen Williams at Marteese's house on several occasions during the summer of 2006. She further testified that she had seen Williams at "a girl named Casey's house" in Arbor Park a couple of days prior to the shooting. Finally, Erika testified that although Williams had a "hoodie" over his face, she knew who he was "even still with the hoodie on." She explained that she knew who he was because, "I know what he looked like and he was coming towards me." This evidence, if believed, was sufficient to prove that Williams was the shooter beyond a reasonable doubt. *Page 14 
B. Prior Calculation and Design
 {¶ 36} Williams argues that the evidence was not sufficient to establish "prior calculation and design" because the state did not present any evidence showing a relationship between him and Tynell. He argues that he was not involved in the altercation between his sister and Erika. He further argues that there was no evidence that he had any problem with Tynell. Finally, and "more importantly," Williams maintains that because Erika testified that he was getting into the car when she was arguing with his mother, this "fact would indicate that the appellant did not have a scheme designed to implement the calculated decision to kill."
 {¶ 37} Aggravated murder, as set forth in pertinent part in R.C. 2903.01(A), provides that" [n]o person shall purposely, and with prior calculation and design, cause the death of another ***." In State v.McCree, 8th Dist. No. 87951, 2007-Ohio-268, this court explained:
 {¶ 38} "`Prior calculation and design' is not defined in the Ohio Revised Code, but is considered to be more than just an instantaneous decision to kill. State v. Clark, 8th Dist. No. 83474, 2004-Ohio-5964, _26, citing State v. Jones, 91 Ohio St.3d 335, 348, 2001-Ohio-57. InState v. Taylor, 78 Ohio St.3d 15, 18-20, 1997-Ohio-243, the Supreme Court of Ohio concluded that `it is not possible to formulate a bright-line test that emphatically distinguishes between the *Page 15 
presence or absence of "prior calculation and design."' Several factors, including whether the accused and the victim knew each other, whether there was thought or preparation in choosing the murder weapon or the murder site, and whether the act was `drawn out' or `an almost instantaneous eruption of events' should be considered under the totality of the circumstances of the homicide to determine whether there was prior calculation and design. State v. Jenkins (1976),48 Ohio App.2d 99, 102. Prior calculation and design can be found even when the plan to kill was quickly conceived and executed. State v. Coley,93 Ohio St.3d 253, 263, 2001-Ohio-1340, citing State v. Palmer,80 Ohio St.3d 543, 567-568, 1997-Ohio-312; State v. Green, 90 Ohio St.3d 352, 358, 2000-Ohio-182." McCree at _70.
 {¶ 39} After reviewing the evidence in a light most favorable to the prosecution, which we are required to do, we find that the evidence was sufficient to prove the element of "prior calculation and design." The testimony presented, if believed, established that Williams came to Karen's home — with a gun — looking for Tynell and Erika. This was within 30 minutes after Erika had gotten into a fight with Williams' sister, Marteese, at the grocery store. The two women had gotten into a fight over Tynell, Erika's longtime boyfriend (who was also the father of one of her children), and whom Marteese had dated briefly. Prior to shooting Tynell, or simultaneous to shooting him, several witnesses *Page 16 
heard Williams yelling at Tynell, something about "fucking" with his sister. Williams then shot at Tynell five or six times, hitting him twice.
 {¶ 40} This evidence was sufficient evidence to prove "prior calculation and design" beyond a reasonable doubt. The jury could reasonably have inferred from the events that occurred a short time before the shooting, as well as what occurred at the scene, that Williams took the gun to Karen's home with "prior calculation and design" to avenge his sister.
 {¶ 41} Accordingly, Williams' first assignment of error is overruled.
 Manifest Weight {¶ 42} In his second assignment of error, Williams argues that there were so many inconsistencies between Erika's, Karen's, and Khristine's testimony that "the testimony of each of these witnesses is questionable."
 {¶ 43} With respect to manifest weight of the evidence, the Supreme Court has stated:
 {¶ 44} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. [Robinson, supra, at 487.] Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the *Page 17 
burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credibleevidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect ininducing belief.' (Emphasis added.) Black's, supra, at 1594.
 {¶ 45} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. [Tibbs, supra, at 42.] See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175 *** (The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction')." Thompkins, supra, at 387.
 {¶ 46} While we agree with Williams that there were some inconsistencies in the three eyewitnesses' testimony, it is not enough to find that the jury clearly lost its way and created a manifest miscarriage of justice. Regardless of the inconsistencies in the details of the events, Erika and Khristine, both of whom *Page 18 
knew Williams, testified that (1) Williams came to their home within 30 minutes of his sister, Marteese, getting into a fight with Erika over Tynell; (2) Williams had a black handgun; (3) Williams said some words to Tynell about "fucking" with Marteese; (4) Williams shot at Tynell multiple times; and (5) Williams fled the scene after the shooting. In addition, Karen, who did not know Williams, essentially corroborated Erika's and Khristine's version of the events. The jury was free to believe these facts and disregard any inconsistencies in the details.
 {¶ 47} Williams further argues that there was no physical evidence presented that linked him to the crime. But "proof of guilt may be made by real evidence, circumstantial evidence, and direct or testimonial evidence, or any combination of the three, and all three have equal probative value." State v. Mallette, 8th Dist. No. 87984, 2007-Ohio-715, _27, citing State v. Nicely (1988), 39 Ohio St.3d 147. In light of the other evidence presented, including the testimony of three eyewitnesses, the fact that there was no physical evidence does not transform Williams' conviction into a manifest miscarriage of justice.
 {¶ 48} Accordingly, Williams' second assignment of error is overruled.
 Flight Instruction to the Jury {¶ 49} In his third assignment of error, Williams argues that the trial court erred when it gave the jury a flight instruction. He claims that the evidence presented at trial did not substantiate such an instruction. We disagree. *Page 19 
 {¶ 50} When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction or giving an instruction constituted an abuse of discretion under the facts and circumstances of the case. See State v. Wolons (1989), 44 Ohio St.3d 64, 68. In addition, jury instructions are reviewed in their entirety to determine if they contain prejudicial error. State v. Porter (1968), 14 Ohio St.2d 10.
 {¶ 51} Evidence of flight is admissible as tending to show consciousness of guilt. State v. Williams, 79 Ohio St.3d 1, 26,1997-Ohio-407. It is well within a trial court's discretion to issue an instruction on flight if sufficient evidence exists in the record to support the charge. State v. Benjamin, 8th Dist. No. 80654, 2003-Ohio-281, _29, 31.
 {¶ 52} Here, the trial court instructed the jury, over Williams' objection, "there may be evidence tending to indicate that the defendant fled from the vicinity of the alleged crime. In this connection, you are instructed that flight in and of itself does not raise a presumption of guilt, but may show consciousness of guilt or a guilty connection with the crime. Therefore, if you find the defendant did flee from the scene of the alleged crime, you may consider the circumstances in the case in determining the guilt or innocence of the defendant." *Page 20 
 {¶ 53} The evidence in the instant case supported such an instruction. Both Erika and Karen testified that Williams fled after shooting Tynell. Accordingly, Williams' third assignment of error is overruled.
 Ineffective Assistance of Counsel {¶ 54} In his fourth assignment of error, Williams argues that his trial counsel was ineffective for failing to subpoena an alibi witness, and for failure to question or challenge a prospective juror during voir dire.
 {¶ 55} In Strickland v. Washington (1984), 466 U.S. 668, the Supreme Court of the United States set forth the two-pronged test for ineffective assistance of counsel. It requires that the defendant show (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. The first prong "requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. The second prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable." Id. See, also, State v. Bradley (1989),42 Ohio St.3d 136 (adopting Strickland).
 {¶ 56} An attorney properly licensed in Ohio is presumed competent.State v. Lott (1990), 51 Ohio St.3d 160, 174. The defendant has the burden of proof and must overcome the strong presumption that counsel's performance was *Page 21 
adequate or that counsel's action might be sound trial strategy.State v. Smith (1985), 17 Ohio St.3d 98, 100. "Ultimately, the reviewing court must decide whether, in light of all the circumstances, the challenged act or omission fell outside the wide range of professionally competent assistance." State v. DeNardis (Dec. 29, 1993), 9th Dist. No. 2245, citing Strickland at 690.
A. Failure to Subpoena Alibi Witness
 {¶ 57} Williams first argues that his trial counsel was ineffective for failing to subpoena an alibi witness, but specifically, because his trial counsel failed to call the alibi witness after he informed the jury during opening statements that they would hear evidence that Williams had an alibi at the time of the crime.
 {¶ 58} Initially, we must point out that defense counsel did provide oral notice to the prosecution of the name and address of an alibi witness. In addition, during opening statements, Williams' trial counsel told the jury, "[w]e will hear evidence that [Williams] was not at East 35th Street. That he was at 123rd and Phillip which is near Superior which is about five and a half miles from there. And he wasn't with nuns, he wasn't with priests. He was with a friend who had made arrangements to come see him at that location before any of this happened."
 {¶ 59} The record reveals that Williams' trial counsel did not present an alibi witness at trial. It is also true there is nothing in the record to indicate *Page 22 
that an alibi witness was subpoenaed to appear at trial. After the state rested, defense counsel simply indicated that he would not be presenting any witnesses. Nor, however, is there anything in the record to indicate that an alibi witness did not appear at trial solely because he or she was not subpoenaed or because they could not be located.
 {¶ 60} It is generally presumed that the tactical decision of calling or refusing to call witnesses will not sustain a claim of ineffective assistance of counsel. State v. Coulter (1992), 75 Ohio App.3d 219, 230;State v. Williams (1991), 74 Ohio App.3d 686, 695. Williams acknowledges this statement of the law, but relies on Middletown v. Allen (1989),63 Ohio App.3d 443, which held:
 {¶ 61} "The mere failure to subpoena witnesses is not a substantial violation of an essential duty to a client in the absence of a showing that testimony of any one or more of the witnesses would have assisted the defense. State v. Reese (1982), 8 Ohio App.3d 202; State v.Pinion (May 4, 1987), 12th Dist. No. CA86-11-020. In the case at bar, the missing witnesses were to have provided appellant with an alibi defense. Counsel delegated the substantial duty of having these witnesses subpoenaed to appellant. These witnesses clearly would have assisted the defense. Counsel failed to subpoena the witnesses or even file a notice of alibi despite his apparent knowledge of the potential exculpatory nature of these witnesses' testimony. Where counsel is aware of *Page 23 
potential alibi witnesses and fails to subpoena them to ensure their presence at trial, such failure constitutes a substantial violation of an essential duty owed to the accused." Middletown at 448.
 {¶ 62} In the case sub judice, it is unknown why defense counsel did not end up calling the alibi witness to the stand. For all this court knows, the alibi the witness was to give was fabricated and the witness backed out of the story at the last minute. Sound trial tactics may have supported counsel's decisions here. See State v. Baker, 12th Dist. CA2005-11-103, 2006-Ohio-5507.
 {¶ 63} In addition, an appellate court addressing a direct appeal is not permitted to add matter to the record which was not part of the trial court proceedings. See, e.g., State v. Hill, 90 Ohio St.3d 571,573, 2001-Ohio-20, citing State v. Ishmail (1978), 54 Ohio St.2d 402. We have no recorded evidence of deficiency or prejudice. Consequently, we cannot find ineffective assistance of counsel on this record.
B. Failure to Question or Challenge Prospective Juror
 {¶ 64} Williams contends that his trial counsel was also ineffective for failing to question or otherwise challenge a juror who had admitted to the court that his relationship with his nephew, who was a Cleveland police officer, "may affect the way [he] feel[s]" about the case. Williams argues that "any reasonable *Page 24 
effective counsel" would have questioned the juror to determine his "bias toward the defendant."
 {¶ 65} In State v. Mundt, 115 Ohio St.3d 22, 2007-Ohio-4836, the Supreme Court of Ohio recently explained:
 {¶ 66} "We have consistently declined to second-guess trial strategy decisions or impose `hindsight views about how current counsel might have voir dired the jury differently.' State v. Mason,82 Ohio St.3d 144, 157, 1998-Ohio-370. See, also, State v. Group, 98 Ohio St.3d 248,2002-Ohio-7247, _139; State v. Murphy, 91 Ohio St.3d 516, 539,2001-Ohio-112; Bradley, 42 Ohio St.3d at 143-144.
 {¶ 67} "`Few decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on the basis of intangible factors.' Miller v. Francis
(C.A.6, 2001), 269 F.3d 609, 620. `The selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities. Written records give us only shadows for measuring the quality of such efforts. *** [T]he selection process is more an art than a science, and more about people than about rules.' Romero v. Lynaugh (C.A.5, 1989), 884 F.2d 871, 878. For these reasons, we have recognized that `counsel is in the best position to determine *Page 25 
whether any potential juror should be questioned and to what extent.'Murphy, 91 Ohio St.3d at 539; see, also, Bradley, 42 Ohio St.3d at 143.
 {¶ 68} "In some cases, asking few or no questions of a prospective juror `may be the best tactic for a number of reasons. For example, questioning by other parties may convince counsel that the juror would be favorable for the defense, and that further questions might only antagonize the juror or give the prosecution a reason to use a peremptory challenge or even grounds for a challenge for cause.'People v. Freeman (1994), 8 Cal.4th 450, 485." Mundt at _63-65.
 {¶ 69} Here, defense counsel asked the juror at issue, as he did all other jurors, his feelings about violence and social issues that concern him the most. The juror responded:
 {¶ 70} "I would be less concerned about [violence], because I don't have an immediate family and I'd rather watch T.V. or read the newspaper. So it's not on me. Probably the social issue would be the drugs, because I think the drugs started a lot of violence."
 {¶ 71} The state argues that "[b]ecause the crux of defense counsel's argument and theory of the case was that [Erika] should not be believed due to her convictions, including drug offenses, it would make perfect trial strategy to keep [the juror] on the jury, as he might very well be open to this line of *Page 26 
argument and might disbelieve [Erika's] testimony, which was the key to [the state's] case." We agree.
 {¶ 72} In fact, during his closing argument, defense counsel opened with an argument relating to Erika's criminal history. He told the jury to imagine a salesperson coming to their door, trying to sell them a get-rich scheme. He argued, "[i]t might be tempting to some of us. Sound good? What if when [the salesperson] leaves you, you Google him on the computer. His name comes up and what do you see? *** [H]e's been convicted of felonies on three occasions. For theft, for receiving stolen property, for receiving an automobile, grand theft, for drugs. *** Would you believe him? Would you believe anybody on their face who has three felonies? *** I doubt that [you] would. When you get information from a three time convicted felon, what do you want before you go a step further to think about the believability of what the person is telling you."
 {¶ 73} Thus, it would have been within a reasonable trial strategy for defense counsel not to challenge this juror, especially because he had a nephew in the police force. Moreover, evidence was also presented that the victim in this case had a long criminal history, which could have caused the juror to not be as sympathetic as he would have been otherwise.
 {¶ 74} As the court in State v. Daniels, 2d Dist. No. 06-CA-093,2008-Ohio-2236, _48, explained, "trial counsel must be allowed wide latitude in making *Page 27 
decisions of trial strategy. We were not present at the trial. [Defense] counsel was, and may have gained a favorable impression of this juror, as being potentially favorable to the defense, based on observations of the juror."
 {¶ 75} Accordingly, Williams' fourth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MARY EILEEN KILBANE, P.J., CONCURS; ANN DYKE, J., CONCURS IN JUDGMENT ONLY *Page 1