[Cite as *State v. Head*, 2023-Ohio-1364.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,           :

                                No. 111562

    v.                            :

ERIC HEAD,                              :

    Defendant-Appellant.          :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:**    AFFIRMED IN PART, REVERSED IN PART,
                   AND REMANDED
**RELEASED AND JOURNALIZED:** April 27, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-645614-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Alicia Harrison, Assistant Prosecuting Attorney, *for appellee.*

Flowers & Grube, Louis E. Grube, and Melissa A. Ghrist, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1}    Defendant-appellant Eric Head appeals his convictions for aggravated burglary, felonious assault, and aggravated murder resulting from the

murder of Darnell Gatson in Gatson's home. Head alleges that he could not be convicted of aggravated burglary or murder because he was a tenant in Gatson's home. He also alleges that the trial court erred by failing to instruct the jury on the law of tenancy and self-defense. Head also appeals his sentence, arguing that he was improperly sentenced on allied offenses of similar import. After review, we find that there was sufficient evidence upon which Head could have been found to trespass in Gatson's home and that the trial court did not abuse its discretion instructing the jury. However, the trial court failed to merge allied offenses of similar import when imposing sentence. Accordingly, Head's convictions are affirmed but the case is remanded solely for resentencing.

I. STATEMENT OF THE CASE AND FACTS

A.     Procedural History

{¶ 2}     Head was indicted on November 13, 2019, for several charges related to the homicide of Darnell Gatson as follows:

Count 1     Aggravated Murder in violation of R.C. 2903.01(B), an unclassified felony, while committing or attempting to commit Aggravated Burglary, R.C. 2911.11;

Count 2     Aggravated Burglary in violation of R.C. 2911.11(A)(1), a felony of the first degree;

Count 3     Murder in violation of R.C. 2903.02(B), an unclassified felony, as a result of Felonious Assault, R.C. 2903.11; and

Count 4     Felonious Assault in violation of R.C. 2903.11(A)(1), a felony of the second degree.

{¶ 3} On March 23, 2022, the trial court commenced a jury trial. At trial, Head claimed that he acted in self-defense in causing Gatson's death. On April 6, 2022, the jury convicted Head of all counts. On May 4, 2022, the trial court held a sentencing hearing. Head asked that the trial court find that all counts of the indictment were allied offenses. The trial court determined that only Counts 1 and 3 were allied offenses of similar import. The state elected for the trial court to sentence Head on Count 1. The trial court imposed a sentence of life in prison without the possibility of parole on Count 1, an indefinite prison sentence of 11 to 16 and one-half years on Count 2, and an eight-year prison sentence on Count 4 and ordered that the sentences be served concurrently.

B. Facts Adduced at Trial

1. Facts Surrounding Gatson's Death

{¶ 4} Lovell Spruce testified that he knew Darnell Gatson since 1984 and he was his best friend. Spruce explained that Gatson had two houses, his residence at 9522 Dunlap Avenue, Cleveland (the "Dunlap House"), and a house near East 163rd Street and Miles Avenue (the "Trap House"). He described that a trap house is a house for drug use. Head stayed at both the Trap House and at the Dunlap House.

{¶ 5} Andre Durham testified that he knew Gatson for five years and that he knew Head stayed at the Trap House a lot. He testified that on Friday night, October 18, 2019, he was at the Trap House and that Gatson and Head got into a verbal argument. Gatson wanted Head to come back to the Dunlap house, but Head

wanted to stay at the Trap House because he had some work the next morning. Ultimately, Head and Gatson left together.

{¶ 6} Durham testified that on Saturday morning, October 19, 2019, he was at the Trap House when Head arrived. Head was wearing flip-flops. Durham asked Head what happened, and Head said he walked from the Dunlap House to the Trap House because Gatson had kicked him out of the Dunlap House. He also testified that Head had drugs and money, which was unusual because Head was always broke. Head also gave the drugs to Durham, telling him to act like they were Durham's so that Head could avoid questioning about how he got them. Head explained to Durham that Gatson had dropped the drugs and money.

{¶ 7} On Saturday, October 19, 2019, Spruce went to the Trap House to hang out. Gatson was not there, and people there were worried. Head was there, but denied knowing where Gatson was, explaining that Gatson had kicked him out of the Dunlap House. On that day, Head was wearing some of Gatson's clothes, which Spruce testified was unusual. Spruce testified that he did not see Gatson on Saturday and tried to call him. That night, he went to the Dunlap House, but did not see any cars or Gatson's truck in the driveway. Spruce said he went around the house, but no lights were on and he did not see anybody there. He testified that Gatson's friends were calling him that night about Gatson.

{¶ 8} On Sunday, Spruce tried to call Gatson and again drove by the Dunlap House. In the afternoon, he, T'Osha Willis, and Kendi Agee went to the Dunlap House to look for him. Spruce climbed in the house through a bathroom window,

and he testified that he found Gatson dead in the front of the house. Willis called 911, and police responded.

{¶ 9} Cleveland Police Detective Rayshon Blue testified about the scene. He stated that Gatson was found in the front left bedroom of the house, that there was blood on the floor and walls, and bloody footprints throughout the house, including the upstairs. He further testified that Gatson's doors were locked and his car was not at the residence. Detective David Borden of the Cleveland Police Department testified that he was assigned to investigate the homicide and went to the Dunlap House. He described the scene as bloody and that there was so much blood, some had started leaking through the floor and into the basement. In examining the scene and the blood on the wall and ceilings, Det. Borden believed that Gatson was lying down when he was struck by a hammer.

{¶ 10} Paper towels found at the scene indicated that someone had tried to clean up some of the blood. Det. Borden also testified that an examination of Gatson's phone revealed Head's DNA was on the phone. As to the bloody footprints, Det. Borden testified that no shoes matching the footprints could be found.

{¶ 11} Dr. Alison Krywanczyk from the Cuyahoga County Medical Examiner's Office testified that Gatson's death was determined to be a homicide, with the death caused by blunt-force trauma to the head, trunk, and extremities. When Gatson was found on Sunday, October 20, 2019, he had been dead for approximately one day. Injuries to Gatson's head, skull, jaw, facial bones, and brain lobes would not have been survivable. The autopsy also revealed severe blunt-force

injuries to Gatson's chest, shoulder, ribs, and sternum. The injuries were caused by an object with a curved or rounded edge and were consistent with injuries that could be caused by a hammer.

{¶ 12} Phillip Buck testified that in October 2019, he was the clinical director of the Cleveland YMCA's Y-Haven treatment facility that serviced people with drug addictions and mental health disorders. Buck stated that Head checked into Y-Haven in October 2019. Buck stated that one day he was alerted by staff that Head had revealed some disturbing information. Freida Bradley, a substance abuse counselor at Y-Haven, testified that Head told her he had a dream that he might have killed someone with a hammer. Bradley took Head to speak with Buck. Buck said that Head told him he had been staying in a trap house and that an incident occurred where he was in an altercation with someone and that he might have killed someone. Buck indicated that he thought Head should notify the police, but that if he did not, he could not remain at Y-Haven.

{¶ 13} Head, with Buck, called 911. Buck told the 911 operator that they were at Y-Haven, which was located on Cleveland Metropolitan Housing Authority ("CMHA") property. Head stated on the call that he may have committed a crime and he wanted to turn himself in, in case he did. Head also stated that the crime was committed in Cleveland. Because Head was vague with the 911 operator, Buck told Head that he should call back and say what the crime might be. Head called back and stated "that there may have been a loss of life" and he was there to turn himself

in. After Head and Buck talked, Head then told the 911 operator, "I think I killed someone."

{¶ 14} CMHA Police Officer Tyshaune Harris responded to Y-Haven after the 911 calls. He stated that Head said he wanted to confess to a serious crime, the loss of life and a murder. Officer Harris detained Head until CMHA Detectives Wright and Jaycox responded. They spoke with Head, who confessed to them that he committed a murder on Dunlap. Head was then taken to the Cleveland Police Department. Det. Borden testified that he saw Head on that date and time and did not notice any visible injuries.

{¶ 15} Head testified at trial, claiming that he acted in self-defense. As to the events surrounding Gatson's death, Head said he did not want to leave the Trap House and go to the Dunlap House on Friday night because he had work to do nearby. However, Head was afraid he would be beaten up if he did not leave with Gatson and went to the Dunlap House with him. He said he cooked dinner, they watched a movie, and he went to bed around 1:00 or 2:00 in the morning.

{¶ 16} Head said that at around 6:00 a.m. on Saturday, Gatson woke him up. Head started to cook breakfast, but Gatson told him to clean the kitchen up. When Head started to clean up the kitchen, he said Gatson "went off about something and he hit me." Head's glasses flew off, and he could not find them. While looking for his glasses, Head said Gatson kicked him. Head found his glasses

on top of the refrigerator.  While cooking breakfast, Head said Gatson told him to clean the living room.

{¶ 17} Head said he went to the living room and began to clean up and Gatson came in and started "swinging at him."  Head said he wanted to leave, but Gatson had him in a choke hold.  Head testified that Gatson was nude and that he wanted Head to perform oral sex.  Head said at that point, he grabbed a hammer that was on the pool table and "started swinging."   He said that he lost his glasses and then ran around the pool table; at that point, Gatson left the room.

{¶ 18} Head testified that he found his glasses in the TV room.  At that point, Gatson returned and kicked Head again, knocking him to the ground.  Gatson tried to get on top of Head, and Head said that he started "swinging again" because he was scared.  Head testified that Gatson fell, bent over the couch, and then fell onto the floor.

{¶ 19} Head testified that he then searched the house for Gatson's keys.  He explained that he needed the keys to get out of the house.  He also said that he was angry and beat up and decided that he would take Gatson's truck and go make some money.  Head said he went to a friend's house, worked with him for a few hours, and then watched some football.  He said he then went to the Trap House and knocked on the door to be let in.  He denied that he was wearing flip-flops or that anyone was

there. He spent the night at the Trap House but left and spent a week or so at a homeless shelter until he was able to get into Y-Haven.

{¶ 20} On cross-examination, Head testified that he lived at the Trap House and that he did not have any clothes at the Dunlap House. Head also said that in the room in which Gatson was found, the only hammer blows he inflicted on Gatson occurred while he was on the ground and Gatson was on top of him. Head also claimed that Gatson was not bleeding when he left the house, that he did not have to change clothes because he did not have any blood on him, that he did not attempt to clean any blood, and that he dropped the hammer before leaving the house. Head also claimed that he lied about being kicked out of the Dunlap House.

2. Testimony Relating to Head's Living Arrangement

{¶ 21} Lovell Spruce testified that when he met Head, Head had a job and a car that Head would rent to Gatson for drugs. Later, Head lost his job, had no place to stay, and he wound up staying at Gatson's houses, both the Trap House and the Dunlap House. Spruce said that Head would do jobs around the houses in that he would clean up, wash cars, and cut grass, being paid with drugs for his work and be given a place to sleep. Spruce testified that Head "didn't pay to stay, so he was working" and that "if you ask me, he was staying for free." Andre Durham testified that he knew Head was one of Gatson's drug customers and that Head started

staying at the Trap House. Durham stated that Head also stayed at the Dunlap House and would cook, clean, and wash cars.

{¶ 22} Head stated that he moved in with Gatson in 2018, did not pay rent, and initially stayed at the Trap House. After Head inherited $28,000, he spent it all with Gatson on crack cocaine. Head testified that after his money ran out, he became a butler, taking care of the lawns, cooking, cleaning, and laundry for Gatson. He testified that because of his work, he was allowed to stay with Gatson. Head said that after Gatson bought the Dunlap House he stayed there, sleeping under the pool table.

C. Motion for Acquittal and Jury Instructions.

1. Motion for Acquittal

{¶ 23} In making a motion for acquittal pursuant to Crim.R. 29, Head's counsel focused on the aggravated murder and aggravated burglary charges. Counsel argued that "all the evidence is that my client lived at the [Dunlap House.]" and that he was a tenant because "he performed jobs and was allowed to live there." Counsel further reasoned that the only way to remove a tenant was through the eviction process. The state asserted that there was no evidence of a rental agreement or lease or that Head exercised control over the Dunlap House, citing the lack of any evidence Head had keys to the Dunlap House or kept possessions there. Further,

the state argued that Head's permission to stay in the Dunlap House was expressly revoked. The trial court denied the motion for acquittal.

2. Jury Instructions

{¶ 24} At the close of trial, Head's counsel asked the court for an instruction on self-defense. The trial court agreed to give an instruction on self-defense and did so as follows:

> "Self-defense, use of deadly force." A person is allowed to use deadly force in self-defense. The State must prove beyond a reasonable doubt that the Defendant, when using deadly force, did not act in self-defense. To prove that the Defendant's use of deadly force was not in self-defense, the State must prove beyond a reasonable doubt at least one of the following:
>
> A. The Defendant was at fault in creating the situation giving rise to striking Darnell Gatson with a hammer; or B. The Defendant did not have reasonable grounds to believe that he was in imminent danger of death or great bodily harm; or C. The Defendant did not have an honest belief, even if mistaken, that he was in imminent danger of death or aggressive bodily harm; or D. The Defendant violated a duty to retreat to avoid the danger; or E. The Defendant used unreasonable force.
>
> * * *
>
> Duty to retreat. The Defendant had a duty to retreat if the Defendant was at fault in creating the situation giving rise to striking Mr. Darnell Gatson with a hammer, or the Defendant did not have reasonable grounds to believe, and an honest belief, that he was in imminent or immediate danger of death or great bodily harm, or that he had a reasonable means of escape from that danger, other than by the use of deadly force.

**{¶ 25}** Head further requested that the trial court instruct the jury on the law of tenancy. The trial court denied that request and instructed the jury as to aggravated burglary as follows:

> Before you can find the defendant guilty of aggravated burglary, you must find beyond a reasonable doubt that on or about October 18, 2019, to October 20, 2019, and in Cuyahoga County, Ohio, the Defendant did, by force, stealth, or deception, trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure when Darnell M. Gatson, a person other than the accomplice, was present with purpose to commit in the structure, or in a separately secured or separately occupied portion of the structure, a criminal offense, to-wit: Felonious Assault and/or Murder and/or Aggravated Murder, and the offender recklessly inflicted or attempted or threatened to inflict physical harm on Darnell Gatson.
>
> * * *
>
> Trespass. * * * No person, without privilege to do so, shall do any of the following:
>
> 1. Knowingly enter land or premises of another.
>
> 2. Knowingly enter land or premises of another, the use of which is lawfully restricted to certain persons, purposes, modes, or hours when the offender knows he is in violation of any such restriction, or is reckless in that regard.
>
> 3. Recklessly enter or remain on the land or premises of another as to which notice against unauthorized access or presence is given by actual communication to the offender, or in a manner prescribed by law, or by posting in a manner reasonably calculated to come to the attention of potential intruders, or by fencing or other enclosure manifest a design to restrict access.
>
> 4. Being on the land or premises of another, negligently fail or refuse to leave upon being notified to do so by the owner or occupant where the agent or servant of either.

"Privilege" means an immunity, license, or right conferred by law or bestowed by express or implied grant, or arising out of status, position, office, or relationship, or growing out of necessity.

"Privilege revoked." Where a defendant lawfully entered a residential premises, the privilege to be in or upon that premises can be inferred to have been revoked when the defendant committed a violent felony directed against another person in the premises who had the ability and authority to revoke the privilege.

D. Allied Offense Determination at Sentencing

{¶ 26} At the sentencing hearing, Head argued that all the offenses for which he was found guilty were the result of one course of conduct and as such, were all allied offenses of similar import and the trial court could impose only one sentence. The state conceded that the aggravated murder and murder counts would merge but argued that the aggravated burglary and felonious assault counts were not allied offenses where there was evidence that he was expressly told to leave and then retrieved a hammer and committed a felonious assault, which actions constituted an aggravated burglary. The state further argued that there were two instances of Head hitting Gatson with the hammer and that the instances were separated by time and space. The trial court found that the counts of aggravated murder, aggravated burglary, and felonious assault were not allied offenses of similar import.

II. LAW AND ARGUMENT

A. Assignments of Error and Summary of Argument

{¶ 27} Head raises four assignments of error relating to the sufficiency of the evidence at trial, the jury instructions, and the trial court's determination of which crimes were allied offenses of similar import. The assignments of error read:

Assignment of Error I:

The trial court erred by failing to enter a judgment of acquittal as to the crimes of felony aggravated murder and aggravated burglary because the state presented insufficient evidence on the essential element of trespass;

Assignment of Error II:

The trial court erred by denying a request for a jury instruction on the law of tenancy;

Assignment of Error III:

The trial court erred by giving an incomplete instruction upon the duty to retreat before engaging in self-defense; and

Assignment of Error IV:

The trial court erred by failing to merge all allied offenses.

B. Standards of Review and Relevant Law

{¶ 28} Head argues within his first assignment of error that there was insufficient evidence presented at trial upon which he could be convicted of the crimes of aggravated murder and aggravated burglary. Specifically, he argues that the state failed to produce evidence that he trespassed in Gatson's home and, as such, he could not be convicted of aggravated burglary or aggravated murder predicated upon the commission of aggravated burglary.

{¶ 29} When reviewing a challenge to the sufficiency of evidence, we determine whether the evidence, if believed, would convince the average juror of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether,

after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* We are mindful that circumstantial and direct evidence "possess the same probative value." *Id.* at 272. The review is not to determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 30} Within his second assignment of error, Head argues that the trial court erred by not instructing the jury on the law of tenancy. In considering a challenge to a trial court's decision regarding a requested jury instruction, the standard of review for an appellate court is whether "the trial court's refusal to give a requested instruction or giving an instruction constituted an abuse of discretion under the facts and circumstances of the case." *State v. Williams,* 8th Dist. Cuyahoga No. 90845, 2009-Ohio-2026, ¶ 50, citing, *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). This court recently explained that

> [a]n abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Such an abuse "'implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). A decision is unreasonable if there is "'no sound reasoning process that would support that decision.'" *In re C.D.Y.*, 8th Dist. Cuyahoga No. 108355, 2019-Ohio-4262, ¶ 8, quoting *Baxter v. Thomas*, 8th Dist. Cuyahoga No. 101186, 2015-Ohio-2148, ¶ 21. A decision is arbitrary if it is made "'without consideration of or regard for facts [or]

circumstances.'" *In re C.D.Y.* at ¶ 8, quoting Black's Law Dictionary 125 (10th Ed.2014).

*In re A.R.*, 8th Dist. Cuyahoga Nos. 111690 and 111746, 2023-Ohio-1038, ¶ 22.

{¶ 31} In his third assignment of error, Head argues that the trial court did not properly instruct the jury as to self-defense because he had a right to be present in the Dunlap House. "Whether jury instructions correctly state the law is a legal issue that an appellate court reviews de novo." *State v. Echevarria*, 8th Dist. Cuyahoga No. 105815, 2018-Ohio-1193, ¶ 27. An incorrect instruction is not sufficient for a reversal. "To show reversible error, the defendant must also demonstrate that he or she was prejudiced by the trial court's refusal to give a requested jury instruction." *Id.* at ¶ 29. "'A reviewing court may not reverse a conviction in a criminal case due to jury instructions unless it is clear that the jury instructions constituted prejudicial error.'" *State v. Shepherd*, 8th Dist. Cuyahoga No. 102951, 2016-Ohio-931, ¶ 25, quoting *State v. McKibbon*, 1st Dist. Hamilton No. C-010145, 2002-Ohio-2041, ¶ 27. If an instruction was not prejudicial then, "'[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.'" *Shepherd* at *id*, quoting Crim.R. 52(A).

{¶ 32} Within his fourth assignment of error, Head argues that the crimes for which he was found guilty are allied offenses of similar import and the trial court should have merged all counts and imposed only one sentence. R.C. 2941.25 codifies the constitutional prohibition of multiple punishment for the same offense; it reads:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment

or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

We review an allied offense claim de novo. *State v. Williams*, 2019-Ohio-794, 132 N.E.3d 1233, ¶ 44 (8th Dist.); R.C. 2941.25.

C.    There Was Sufficient Evidence to Allow the Jury to Consider the Charges of Aggravated Murder and Aggravated Burglary

{¶ 33} In this case, Head disputes the sufficiency of the evidence as it pertains to whether he committed a trespass in the Dunlap House. Appellant argues that because he had a right or privilege to be in the victim's home, he could not be found to have trespassed and thus could not be found to have committed aggravated burglary or aggravated murder. The state argues that there was evidence at trial that any privilege Head had to be in the Dunlap House was either expressly revoked by Gatson or implicitly revoked by Head's commission of felonious assault.

{¶ 34} The elements of a criminal trespass are found in R.C. 2911.21, which provides in pertinent part that

(A)    No person, without privilege to do so, shall do any of the following:

(1)    Knowingly enter or remain on the land or premises of another;

* * *

(F)    As used in this section:

(2) "Land or premises" includes any land, building, structure, or place belonging to, *controlled by, or in custody of another*, and any separate enclosure or room, or portion thereof.

(Emphasis added.)

{¶ 35} Whether a criminal trespass can occur is not determined simply upon reference to property records or the production of a lease of a property; rather, the issue to be determined is whether a defendant has, without privilege, knowingly entered or remained on the land or premises of another. The Ohio Supreme Court explained that

> [b]ecause the purpose of burglary law is to protect the dweller, we hold that custody and control, rather than legal title, is dispositive. See R.C. 2911.21(E), providing that "'land or premises' includes any land, building, structure, or place belonging to, *controlled by, or custody of another*, and any separate enclosure or room, or portion thereof." (Emphasis added.) Thus, in Ohio, one can commit a trespass and burglary against property of which one is the legal owner if another has control or custody of that property.

*State v. Lilly*, 87 Ohio St.3d 97, 102, 717 N.E.2d 322 (1999).

{¶ 36} In *State v. Nelson*, 11th Dist. Ashtabula No. 2002-A-0019, 2003-Ohio-5699, the court determined that the leaseholder of an apartment could commit a trespass. The court explained the factors leading to its decision in finding the defendant in that case could be found to be committing a trespass:

> Accordingly, even if Nelson was on the lease, the state presented evidence that Hoffacher was exercising custody and control of the residence. Specifically, the state presented evidence that Nelson did not use a key to gain access to the residence but, rather, entered the house by pushing in the plastic covering a window. Nelson indicated in his statement to the police that Kessler's clothes were in the basket he burned. He also stated he threw the paint in the bedroom because he knew that was where Kessler and Hoffacher slept. Further, he stated

that he had broken up with Hoffacher, and was dating another woman on the night in question. Finally, Officer John A. Bainton, III, of the Ashtabula Police Department testified that Nelson indicated that he was living with his current girlfriend at the time of the incident. Taken together and viewed in a light most favorable to the prosecution, this evidence is sufficient evidence to show that Hoffacher had custody and control of the premises. Thus, pursuant to the holding in *Lilly*, Nelson could be convicted of burglary, even if his name was on the lease.

*Nelson* at ¶ 23.

{¶ 37} In this case, Head claims he had a tenancy at the Dunlap House due to his arrangement to provide services for the privilege to live there. He argues this arrangement was a legal tenancy and that because he had not been legally evicted, he had an unrevoked privilege to be in the Dunlap House. The state argues that Head stayed at the victim's home by invitation and that there was evidence that any privilege Head had to be in the Dunlap House was expressly revoked. Further, the state argues that Head's commission of a violent crime implicitly revoked his privilege to be in the Dunlap House.

{¶ 38} Despite Head's reliance on property law, the criminal trespass statute serves to protect those with control of property. As noted by the Ohio Supreme Court, the burglary statute, which contains the elements of trespass, protects a person who has control of their dwelling. *Lilly*, *supra*. There is no dispute in the record that Gatson possessed and had control of the Dunlap House in which he was killed. Gatson both owned the premises and had the keys. While there is no dispute in the record that Head had stayed at the Dunlap House, notably, there was no evidence that Head had any control of the premises; there was no evidence of a

written rental or lease agreement, no evidence Head had keys to either the Dunlap House or the Trap House, or that Head had clothes or possessions within the Dunlap House. In contrast, there is evidence that Gatson expressly revoked any privilege Head had to be at the premises when Head stated Gatson kicked him out of the Dunlap House and Head left, ceding any control he may have had over those premises.

{¶ 39} Additionally there was evidence that Gatson and Head went to the Dunlap House on Friday night at Gatson's direction. Given the lack of evidence that Head exerted any control over the premises, the evidence indicates that Head was at the Dunlap House by direction or invitation. Accordingly, in light of the definition and law regarding criminal trespass, Head would be considered to be Gatson's guest. Where a guest has a privilege to be in a home, that privilege may be revoked upon the commission of an act of violence against a person "who has the authority to revoke the privilege of initial entry." *State v. Steffen*, 31 Ohio St.3d 111, 115, 509 N.E.2d 383 (1987); *State v. Johnson*, 8th Dist. Cuyahoga No. 97698, 2012-Ohio-3812, ¶ 18. The evidence that Head struck Gatson with a hammer was sufficient to allow the jury to also find that Head's privilege to stay at the Dunlap House was revoked by his commission of a violent offense.

{¶ 40} When examining the evidence in the light most favorable to the state, there was sufficient evidence presented at trial that Gatson had control of the Dunlap House. Further, there was evidence upon which jury could conclude Head had a privilege to be in the Dunlap House and that his privilege was either expressly

revoked by Gatson telling him to leave or was implicitly revoked by Head's commission of a violent crime against Gatson.

{¶ 41} The first assignment of error is overruled.

D. The Trial Court Did Not Err by Denying the Request to Instruct the Jury on the Law of Tenancy

{¶ 42} Within the second assignment of error, Head contends that the trial court erred by not instructing the jury on the law of tenancy as requested. He argues that because the jury was not instructed on the law of tenancy, it was unaware Head had a right to be in the Dunlap House and therefore could not commit a trespass. In making his argument, Head reiterates his arguments that the evidence at trial was conclusive that he had a tenancy in the Dunlap House and thus could not be found to have trespassed. Our resolution of Head's first assignment of error precludes our finding an abuse of discretion in the trial court's determination to not instruct the jury on the law of tenancy.

{¶ 43} The trial court instructed the jury on privilege and when that privilege could be revoked:

> "Privilege" means an immunity, license, or right conferred by law or bestowed by express or implied grant, or arising out of status, position, office, or relationship, or growing out of necessity.

> "Privilege revoked." Where a defendant lawfully entered a residential premises, the privilege to be in or upon that premises can be inferred to have been revoked when the defendant committed a violent felony directed against another person in the premises who had the ability and authority to revoke the privilege.

Although Head argues that the state acknowledged Head's tenancy during closing arguments wherein it argued that he was not a tenant, that argument is not evidence of a concession on the part of the state. In closing, the state argued that Head was not a tenant because he was simply allowed to stay at the Dunlap House at Gatson's discretion. Further, the state argued that Head was either kicked out or became a burglar when Head "took that hammer and he smacked him upside the head with it." We do not construe this argument as being a concession that there was sufficient evidence that Head was a tenant in the Dunlap House, rather the argument comports with the jury instructions given by the trial court.

{¶ 44} The second assignment of error is overruled.

E. The Trial Court Did Not Err in Instructing the Jury on the Law of Self-Defense

{¶ 45} Within the third assignment of error, Head contends the trial court erred by instructing the jury that Head had a duty to retreat when it considered his claim of self-defense. Head asserts that the trial court should have instead instructed the jury that he had no duty to retreat, citing R.C. 2901.09(B)[1] which read that

> [f]or purposes of any section of the Revised Code that sets forth a criminal offense, *a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense*, defense of another, or defense of that person's residence, and a person who lawfully is an occupant of that person's vehicle or who lawfully is an occupant in a vehicle owned by an immediate family member of the

---

[1] R.C. 2901.09(B) has been amended and now provides that "[f]or purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence if that person is in a place in which the person lawfully has a right to be."

person has no duty to retreat before using force in self-defense or defense of another.

(Emphasis added.) Head asserts that the decision to instruct the jury that Head had a duty to retreat was error because the jury could have believed that Head was lawfully present "in his home" at the Dunlap House. Our resolution of Head's first and second assignments of error negate Head's arguments that he had a tenancy and was lawfully in his home at the time of Gatson's homicide. As such, we cannot say the trial court abused its discretion by failing to give an instruction pursuant to R.C. 2901.09(B).

{¶ 46} The third assignment of error is overruled.

F. The Trial Court Should Have Found the Aggravated Murder and Aggravated Burglary Convictions to Be Allied Offenses of Similar Import.

{¶ 47} Our review of an allied offense question is de novo. *State v. Webb*, 8th Dist. Cuyahoga No. 98628, 2013-Ohio-699, ¶ 4, citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28. R.C. 2941.25 codifies the constitutional prohibition of multiple punishments for the same offense. Because R.C. 2941.25 focuses on the defendant's conduct, a court's determination of whether the defendant has been found guilty of allied offenses of similar import is dependent upon the facts of the case. *State v. Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658,

71 N.E.3d 234, ¶ 18, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 26.

{¶ 48} Because an offense may be committed in a variety of ways, the Ohio Supreme Court has held that a defendant may be convicted and sentenced for multiple offenses when either "(1) the offenses are dissimilar in import or significance — in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation." *Ruff* at ¶ 25.

{¶ 49} Head was sentenced for committing aggravated murder, aggravated burglary, and felonious assault. Head argues that these crimes are allied offenses of similar import as the evidence at trial was that they were committed with one animus and in one continuous course of conduct. In reviewing a claim that offenses are allied, this court has found "the focus of allied offense inquiries is on the offender's conduct that constitutes the commission of the offense, not upon the temporally related course of conduct or same acts or transactions analysis or the act being considered as one continuous act. We cannot read the latter propositions into R.C. 2941.25 or *Ruff*." *State v. Rucker*, 2020-Ohio-2715, 154 N.E.3d 350, ¶ 24 (8th Dist.).

{¶ 50} In a case in which an offender was sentenced for both aggravated murder and aggravated burglary, we noted that the aggravated burglary occurred when the offender entered the apartment complex with the intent to harm the victim. *State v. McFarland*, 8th Dist. Cuyahoga No. 105570, 2018-Ohio-2067, ¶ 47.

We then found that aggravated burglary was a separate act and was not an allied offense with aggravated murder. *Id.* Similarly, in *State v. Hawkins*, 8th Dist. Cuyahoga No. 111519, 2022-Ohio-4288, ¶ 33, this court recognized that the offenses of aggravated murder and aggravated burglary are not necessarily allied offenses of similar import to be merged where a felonious assault occurs and then fatal blows are struck in a short amount of time.

{¶ 51} In contrast, where the facts are clear that the aggravated murder is predicated solely upon the commission of an aggravated burglary with no other indicia of a separate crime or animus, the offenses of aggravated burglary and aggravated murder are found to be allied offenses of similar import. *E.g., State v. Ramey*, 2d Dist. Montgomery No. 27636, 2018-Ohio-3072; *State v. Seymore*, 12th Dist. Butler No. CA2021-09-113, 2022-Ohio-2180.

{¶ 52} Head argues that the facts at trial present a burglary committed without a separate animus from the felonious assault that resulted in Gatson's death. As such, he argues that all three offenses for which he was found guilty are allied offenses of similar import. The state contends that the burglary is a separate offense from the murder and evidence showed the burglary was committed when Head, having either had his privilege to be in the house expressly or implicitly revoked, first struck Gatson with the hammer. It thus argues that the burglary was committed with a separate animus from the murder of Gatson.

{¶ 53} The indictment in this case alleged that the aggravated murder was premised upon the commission of aggravated burglary or upon felonious assault.

In this case, the evidence presented was that the trespass was committed by the commission of violence against Gatson. Although there was testimony that Head said he was "kicked out" of the Dunlap House, there is no evidence that Head left the Dunlap House and returned to kill Gatson. In contrast, the evidence indicated, and the state argued, that Head trespassed while he was in the Dunlap Home because he committed a violent act. Accordingly, without a separate animus for the commission of the aggravated burglary, we find that in this case the counts of aggravated burglary and aggravated murder are allied offenses of similar import. However, there is evidence that supports a finding that the felonious assault charge was not an allied offense.

{¶ 54} The state identified evidence supporting a finding that Head caused separate and identifiable harm in the commission of the felonious assault where there were multiple nonlethal injuries sustained by Gatson and there was a significant break; Head testified that after he hit Gatson by the pool table, Gatson left the area. Because there was a significant break in time and circumstance between the nonlethal blows Head inflicted and the eventual lethal blows, the evidence supports a finding that Head acted with a separate animus and caused separate and distinct harm in committing felonious assault. Accordingly, we vacate

the sentence imposed and remand tor the trial court for the sole purpose of resentencing Head.

{¶ 55} The fourth assignment of error is sustained in part and overruled in part.

III. CONCLUSION

{¶ 56} Head was found guilty of aggravated murder, aggravated burglary, and felonious assault. The conviction was based on sufficient evidence where the evidence at trial allowed the jury to find that Head trespassed in the Dunlap House where Gatson was killed. Further, because the evidence did not establish that Head had control of the premises where the murder occurred, the trial court did not abuse its discretion in not instructing the jury on the law of tenancy and that Head did not have a duty to retreat when it considered Head's claim of self-defense. Finally, the trial court erred by imposing sentences on both aggravated murder and aggravated burglary.

{¶ 57} Judgment affirmed in part and reversed in part, and the case is remanded for further proceedings.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
MICHAEL JOHN RYAN, J., CONCUR